# IN THE SUPREME COURT OF IOWA

No. 18–1280

Filed June 28, 2019

**JOSHUA VENCKUS,**

Appellee,

vs.

**CITY OF IOWA CITY; ANDREW RICH; JOHNSON COUNTY, IOWA; ANNE LAHEY; NAEDA ELLIOTT;** and **DANA CHRISTIANSEN,**

Appellants.

---

Appeal from the Iowa District Court for Johnson County, Chad Kepros, Judge.

Interlocutory appeal from the denial of motions to dismiss claims arising out of an allegedly wrongful prosecution. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Robert M. Livingston and Kristopher K. Madsen of Stuart Tinley Law Firm, LLP, Council Bluffs, and Susan D. Nehring, Assistant County Attorney, Iowa City, for appellants Johnson County, Anne Lahey, Naeda Elliott, and Dana Christiansen.

Eric R. Goers and Susan Dulek, Assistant City Attorneys, for appellants City of Iowa City and Andrew Rich.

Martin A. Diaz, Swisher, and M. Victoria Cole, Cedar Rapids, for appellee.

Alan R. Ostergren, Muscatine, for amici curiae Iowa County Attorneys Association and Iowa State Association of Counties.

Joel E. Fenton of Law Offices of Joel E. Fenton, PLC, Des Moines, for amicus curiae Iowa Association for Justice.

**McDONALD, Justice.**

Joshua Venckus was charged with sexual abuse in the second degree and acquitted. Following acquittal, Venckus filed this civil action against the police investigator, the prosecutors, and the municipalities that investigated and prosecuted the criminal case. Venckus asserted common law claims and state constitutional claims against the defendants. The defendants moved to dismiss Venckus's claims on the grounds the defendants were immune from suit, the claims were time barred, and the state constitutional claims were disallowed because an adequate nonconstitutional remedy existed. The district court denied the defendants' motions to dismiss, and we granted the defendants' applications for interlocutory appeal.

## I.

This court reviews rulings on motions to dismiss for the correction of legal error. *Godfrey v. State*, 898 N.W.2d 844, 847 (Iowa 2017). To the extent that we review constitutional claims, the standard of review is de novo. *See McGill v. Fish*, 790 N.W.2d 113, 116–17 (Iowa 2010). In reviewing the ruling, "we accept all well-[pleaded] facts in the petition as true." *Godfrey*, 898 N.W.2d at 847.

## II.

In February 2013, Venckus resided in Iowa City, Johnson County, Iowa. On the weekend of February 15–17, Venckus left Iowa City and spent the weekend at his parents' home in Chicago, Illinois. While Venckus was in Chicago, Venckus's roommates hosted a party at their residence. After the party ended, a man broke into the residence and sexually assaulted an intoxicated and incapacitated woman who had remained in the home. The woman managed to escape during the assault and obtain assistance.

Iowa City Police Department Investigator Andrew Rich was the principal investigator assigned to the case. The victim reported a single assailant. The police found a wallet outside a window well of the residence. The wallet belonged to Ryan Lee Markley. The police found Markley's handprint on the basement window used for entry. The police found a boot print matching Markley's boot on a chair underneath the window. The police recovered a marijuana pipe stolen from the residence in Markley's apartment. Markley's DNA matched DNA found on the victim's body. However, DNA of "one single sperm found in the [victim's] cervix" matched Venckus's DNA.

The police interviewed Venckus and his roommates. All interviewees explained Venckus was in Chicago at the relevant time. To prove his alibi, Venckus turned over his cell phone and bank card to Rich. Venckus provided the names of alibi witnesses. Venckus also obtained an expert witness who accounted for the presence of Venckus's DNA. The assault occurred in Venckus's home. The blanket that covered the victim while she slept was from Venckus's bedroom, and the blanket was replete with Venckus's DNA. Venckus's expert witness report showed "the DNA evidence of one sperm found in the cervix represented evidence of a transfer from the blanket covering the victim and could not represent the sole evidence of DNA left by a rapist."

Rich arrested Venckus on January 24, 2014, on the charge of sexual abuse in the second degree. The affidavit supporting the arrest warrant provided as follows:

> This Def[endant] stated during an interview that he was not even in [Iowa City] when the attack occurred. However, DNA evidence developed in the course of this investigation proves the Def[endant] was not only present but participate[d] in this attack and left the victim with multiple injuries requiring immediate medical attention.

The Johnson County Attorney's Office—specifically defendants Anne Lahey, Naeda Elliott, and Dana Christiansen—prosecuted the case. From August 2015 through the criminal trial in September 2016, Venckus's defense counsel uploaded exculpatory information onto a web-based file sharing service, which was made available to the police and prosecutors. The prosecutors took the case to trial. Venckus was acquitted.

Subsequently, Venckus filed the petition at issue. Venckus asserted claims against Investigator Rich and the City of Iowa City (collectively police defendants) for defamation, abuse of process, and malicious prosecution. Venckus asserted claims against Lahey, Elliott, Christiansen, and Johnson County (collectively prosecutor defendants) for abuse of process. Against all defendants, Venckus asserted tort claims arising under the Iowa Constitution, including violations of the following: the rights to freedom of movement and association under article I, section 1; the right to liberty arising under article I, section 1; the rights to due process, a fair trial, and equal protection guaranteed by article I, sections 6 and 9; and the right against unreasonable search and seizure guaranteed by article I, section 8.[1]

The defendants moved to dismiss the petition. The prosecutor defendants contended they were absolutely immune from suit. The police defendants contended they were absolutely immune from suit, the

---

[1]In *Godfrey v. State*, this court held the State of Iowa and state officials acting in their official capacities could be sued directly for violations of the equal protection and due process clauses of the Iowa Constitution but only where state law does not otherwise provide an adequate damage remedy. 898 N.W.2d at 846–47; *id.* at 880–81 (Cady, C.J., concurring in part and dissenting in part). The parties have not asked us to reconsider *Godfrey*, to consider whether a *Godfrey*-type claim can be asserted for alleged violations of the Iowa Constitution other than those recognized in *Godfrey*, or to determine whether *Godfrey*-type claims can be asserted against municipalities. In the absence of any argument on these issues, we assume without deciding Venckus has asserted cognizable constitutional claims for damages.

plaintiff's claims were barred by the statute of limitations, and the state constitutional claims were disallowed because an adequate nonconstitutional remedy existed under the Iowa Municipal Tort Claims Act (IMTCA). The district court granted the motions to dismiss. Venckus filed a motion to reconsider. The district court granted the motion and denied in entirety the motions to dismiss.

## III.

The prosecutor defendants contend they are absolutely immune from suit pursuant to the judicial process immunity. In resolving the argument, we first discuss the nature and scope of the judicial process immunity. We then determine whether the district court erred in denying the prosecutor defendants' motion to dismiss.

## A.

To advance the practical administration of government, the law recognizes certain government officials should be absolutely immune from suit for conduct relating to the discharge of certain government functions. *See Hlubek v. Pelecky,* 701 N.W.2d 93, 96 (Iowa 2005) ("Absolute immunity ordinarily is available to certain government officials such as legislators, judges, and prosecutors acting in their official capacities . . . .").

One well-established immunity is the judicial process immunity. Under the judicial process immunity, government officials are absolutely immune from suit and damages for conduct "intimately associated with the judicial phase of the criminal process." *Minor v. State,* 819 N.W.2d 383, 394 (Iowa 2012) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S. Ct. 984, 995 (1976)). The judicial process immunity protects both government officials and their employing municipalities. *See Moser v. County of Black Hawk,* 300 N.W.2d 150, 152, 153 (Iowa 1981) (affirming dismissal of malicious prosecution claim against county based on county

attorney's entitlement to absolute immunity); *Burr v. City of Cedar Rapids*, 286 N.W.2d 393, 396 (Iowa 1979) ("The public policy which requires immunity for the prosecuting attorney, also requires immunity for both the state and the county for acts of judicial and quasi-judicial officers in the performance of the duties which rest upon them . . . ." (quoting *Gartin v. Jefferson County*, 281 N.W.2d 25, 31 (Iowa Ct. App. 1979))).

It is well established the judicial process immunity applies to common law torts, but it is a question of first impression whether the judicial process immunity applies to torts arising under the Iowa Constitution. In *Baldwin v. City of Estherville*, decided last term, we intimated the immunity would apply, noting "[c]onstitutional torts are torts, not generally strict liability cases." 915 N.W.2d 259, 281 (Iowa 2018). We further noted traditional immunities "could apply to state constitutional claims." *Id.* We did not decide the issue, however, because the issue was not directly presented. *See id.*

Now that the question is directly presented, we make explicit what was implicit in *Baldwin*: the judicial process immunity applies to state constitutional torts. This conclusion necessarily flows from the nature of the immunity itself. "When faced with a question of whether a government official has absolute immunity from civil liability . . . , we employ a 'functional approach' to determine whether those actions 'fit within a common-law tradition of absolute immunity.' " *Minor*, 819 N.W.2d at 394 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S. Ct. 2606, 2613 (1993)). "Under this 'functional approach,' we do not look to the identity of the government actor, but instead to 'the nature of the function performed.' " *Id.* (quoting *Forrester v. White*, 484 U.S. 219, 229, 108 S. Ct. 538, 545 (1988)); *see Cleavinger v. Saxner*, 474 U.S. 193, 201, 106 S. Ct. 496, 501 (1985) ("Absolute immunity flows not from rank or title or

'location within the Government,' but from the nature of the responsibilities of the individual official." (quoting *Butz v. Economou*, 438 U.S. 478, 511, 98 S. Ct. 2894, 2913 (1978))). We grant absolute immunity for only

> those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed "with independence and without fear of consequences."

*Rehberg v. Paulk*, 566 U.S. 356, 363, 132 S. Ct. 1497, 1503 (2012) (quoting *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 1218 (1967)).

The functional approach demonstrates the "[i]mmunity . . . is not for the protection of the [official] personally, but for the benefit of the public." *Beck v. Phillips*, 685 N.W.2d 637, 643 (Iowa 2004). The immunity benefits the public by protecting government officials involved in "the judicial process from the harassment and intimidation associated with litigation." *Minor*, 819 N.W.2d at 394 (emphasis omitted) (quoting *Burns v. Reed*, 500 U.S. 478, 494, 111 S. Ct. 1934, 1943 (1991)). The same public-interest considerations that justify the judicial process immunity apply whether the legal claims arise under common law or the state constitution. *See Butz*, 438 U.S. at 512, 98 S. Ct. at 2913 ("Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.").

We draw further support for our conclusion the judicial process immunity applies to state constitutional torts from analogous federal cases. The federal circuit courts unanimously hold the judicial process immunity applies to federal constitutional claims brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971). *See Humphries v. Houghton*, 442 F. App'x

626, 628–29, 629 n.5 (3d Cir. 2011) (per curiam) (stating absolute immunity for federal prosecutor applies to *Bivens* claims); *Rodriguez v. Lewis*, 427 F. App'x 352, 353 (5th Cir. 2011) (per curiam) ("Because Martinez was acting within the scope of his employment as a prosecutor during the sentencing hearing, he enjoys absolute immunity from *Bivens* liability."); *Pangelinan v. Wiseman*, 370 F. App'x 818, 819 (9th Cir. 2010) (holding absolute immunity applies to *Bivens* claims against federal judges and federal prosecutors); *Nogueras-Cartagena v. U.S. Dep't of Justice*, 75 F. App'x 795, 798 (1st Cir. 2003) (per curiam) ("The existence of absolute prosecutorial immunity is a matter of function . . . . In this instance, the challenged conduct . . . was intimately associated with the judicial phase of the criminal process. It was, therefore, essentially prosecutorial in nature. Hence, immunity attaches." (Citations omitted.)); *Blakely v. United States*, 276 F.3d 853, 871 (6th Cir. 2002) (holding absolute immunity barred *Bivens* claim); *Benson v. Safford*, 13 F. App'x 405, 407 (7th Cir. 2001) (holding in *Bivens* action that "[p]rosecutors . . . are absolutely immune from suits challenging conduct intimately associated with the criminal judicial process"); *Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000) (per curiam) (holding absolute immunity applies to *Bivens* claims); *Lyles v. Sparks*, 79 F.3d 372, 376 (4th Cir. 1996) ("In *Bivens*-type actions, as at common law, prosecutors enjoy absolute immunity for conduct 'intimately associated with the judicial phase of the criminal process.'" (quoting *Imbler*, 424 U.S. at 430, 96 S. Ct. at 995)); *Thompson v. Walbran*, 990 F.2d 403, 404 (8th Cir. 1993) (per curiam) (holding absolute immunity barred *Bivens* claim against a prosecutor); *Daloia v. Rose*, 849 F.2d 74, 75 (2d Cir. 1988) (per curiam) ("The prosecutor's activities in this case were all 'intimately associated with the judicial phase of the criminal process,' and he is therefore entitled to absolute immunity." (quoting *Imbler*, 424

U.S. at 430, 96 S. Ct. at 995)); *Tripati v. U.S. Immigration & Naturalization Serv.*, 784 F.2d 345, 346–47 (10th Cir. 1986) (per curiam) (finding a U.S. attorney was absolutely immune from a *Bivens* claim).

Venckus appears to recognize the judicial process immunity applies here. Rather than distinguishing this case from our precedents, he asks us to do away with absolute immunity regardless of the source of the legal claim and instead adopt a rule of qualified immunity under the all-due-care standard set forth in *Baldwin*. *See* 915 N.W.2d at 279–81. In support of his position with respect to his constitutional claims, Venckus argues absolute immunity is inconsistent with the Iowa Constitution. With respect to all of his claims, Venckus argues prosecutorial misconduct and wrongful convictions are rampant and absolute immunity contributes to this because it gives government officials a wide berth to engage in misconduct.

We reject Venckus's request to do away with the judicial process immunity. First, with respect to his constitutional claims, it appears Venckus conflates two separate issues. The judicial process immunity is a common law immunity. It bars suit and damages against government officials for conduct intimately associated with the judicial process. It immunizes conduct without regard to the substantive source of the legal claim. In contrast, the all-due-care immunity set forth in *Baldwin* is a constitutional immunity. It bars suit and damages only for constitutional claims and only when the government official proves "that he or she exercised all due care to conform with the requirements of the law." *Id.* at 260–61. The *Baldwin* immunity is in addition to any other common law immunities or defenses available and not a comprehensive substitute immunity.

Second, Venckus offers no compelling justification to overrule our long-standing precedents holding the judicial process immunity applies to common law claims. "From the very beginnings of this court, we have guarded the venerable doctrine of stare decisis and required the highest possible showing that a precedent should be overruled before taking such a step." *Kiesau v. Bantz*, 686 N.W.2d 164, 180 n.1 (Iowa 2004) (Cady, J., dissenting), *overruled by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016); *see Hildreth v. Tomlinson*, 2 Greene 360, 361 (Iowa 1849). Venckus has not established our prior decisions should be overruled. To the contrary, as discussed above, the judicial process immunity is of long standing in Iowa and was recently reaffirmed in *Minor*. *See* 819 N.W.2d at 397–99.

Third, with respect to all of his claims, Venckus's policy concerns are not new. In crafting the judicial process immunity over the course of time, our cases have considered the issues of prosecutorial misconduct, the risk of wrongful conviction, and the need for unencumbered judicial process. The cases have struck the right policy balance between these competing concerns. *See Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) ("As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done . . . than to subject those who try to do their duty to the constant dread of retaliation."). While the absolute immunity is necessary for the proper functioning of the judicial process, it does not give government officials carte blanche to engage in misconduct. The judicial process immunity is narrowly tailored to immunize only conduct "intimately associated with the judicial phase of the criminal process." *See Minor*, 819 N.W.2d at 394–95 (quoting *Imbler*, 424 U.S. at 430, 96 S. Ct. at 995). Further, there are

other mechanisms that restrain official conduct, including vigorous judicial oversight in the district court, appellate review, postconviction-relief proceedings, attorney disciplinary proceedings, human resource management, and elections. As the Supreme Court explained,

> [T]he safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. Advocates are restrained not only by their professional obligations, but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.

*Butz*, 438 U.S. at 512, 98 S. Ct. at 2914 (footnote omitted). Against this regulatory backdrop, the abandonment of the absolute immunity in favor of qualified immunity is unnecessary to achieve Venckus's stated policy objectives. This is true without regard to the source of the legal claim.

For these reasons, we hold a government official is absolutely immune from suit and damages with respect to any claim arising out of the performance of any function intimately related to the judicial phase of the criminal process whether the claim arises at common law or under the state constitution.

### B.

We next address the application of the judicial process immunity to the prosecutor defendants. The district court denied the prosecutor defendants' motion to dismiss on two grounds. First, with respect to the state constitutional claims, the district court appeared to hold the

prosecutor defendants could assert only a qualified immunity rather than an absolute immunity. Second, the district court held the claim for abuse of process was not sufficiently developed and directed "the defendants to raise their defenses as to immunity again at an appropriate time when the actual facts underlying these allegations are more fully known." With one exception, which will be discussed below, we conclude the district court erred in denying the prosecutor defendants' motion to dismiss.

As discussed in the preceding section, the judicial process immunity applies to common law torts and state constitutional torts, and the district court erred in holding to the contrary. It is long-established the absolute immunity applies to the conduct of prosecutors. In *Blanton v. Barrick*, we held prosecutors are entitled to absolute immunity related to the prosecution of criminal cases. *See* 258 N.W.2d 306, 309 (Iowa 1977) ("Clearly, as previously stated, prosecutors performing their official duties are quasi-judicial officials, not non-judicial functionaries and should be able to vigorously proceed with their tasks unhampered by the fear of unlimited civil litigation."). In subsequent cases, we adopted and applied a functional approach to conclude prosecutors are entitled to absolute immunity for activities "intimately associated with the judicial phase of the criminal process." *Hike v. Hall*, 427 N.W.2d 158, 159 (Iowa 1988) (quoting *Imbler*, 424 U.S. at 430, 96 S. Ct. at 995).

The district court also erred in concluding the claims against the prosecutor defendants were not sufficiently clear to resolve the prosecutor defendants' assertion of absolute immunity. Venckus's primary complaint is the prosecutor defendants continued a "reckless crusade" to convict Venckus in the face of "overwhelming evidence" of Venckus's innocence. Venckus argues the prosecutors refused to drop the charges because they did not want to admit they had charged an innocent man. However, the

decisions to initiate a case and continue prosecution are at the core of the judicial process immunity. *See Imbler*, 424 U.S. at 430–31, 96 S. Ct. at 995 (1976) (finding "initiating a prosecution and . . . presenting the State's case" were parts of the judicial process and necessitated immunity); *Beck*, 685 N.W.2d at 643 ("The decision to bring criminal charges is clearly 'intimately associated with the judicial phase of the criminal process' . . . ." (quoting *Hike*, 427 N.W.2d at 159; and *Burr*, 286 N.W.2d at 396)); *Hike*, 427 N.W.2d at 160 (holding "a prosecutor's use of his authority to drop or continue pending criminal charges" was absolutely immune regardless of whether the charges had a basis); *Blanton*, 258 N.W.2d at 310 ("A public prosecutor acting in his official capacity is absolutely privileged to initiate, institute, or continue criminal proceedings." (quoting Restatement (Second) of Torts § 656, at 414 (Am. Law Inst. 1977))). This is true without regard to motive or intent. The "immunity applies even when the [official] is accused of acting maliciously and corruptly because as a matter of policy it is in the public best interest that [officials] should exercise their function without fear of consequences and with independence." *Blanton*, 258 N.W.2d at 308; *accord Beck*, 685 N.W.2d at 642 ("Because we apply a functional analysis, immunity attaches even when the prosecutor is alleged to have acted for improper reasons.").

Much of the remainder of Venckus's claims relate to the prosecutor defendants' strategic and discretionary decisions regarding the prosecution of the case. Venckus challenges the prosecutors' decision to enter into a lenient plea agreement with Markley in exchange for Markley's testimony. Venckus challenges the prosecutors' subsequent decision to not call Markley as a witness despite the favorable plea agreement. Venckus challenges the prosecutors' decision to "shop" around for an

expert witness to rebut Venckus's DNA expert. And Venckus challenges the prosecutors' evaluation of the alibi evidence presented.

None of this challenged conduct is actionable. Venckus admits all of the prosecutor defendants' challenged conduct occurred after the development of probable cause to arrest and charge Venckus. *See Buckley*, 509 U.S. at 274 n.5, 113 S. Ct. at 2616 n.5 ("The reason that lack of probable cause allows us to deny absolute immunity to a state actor for the former function (fabrication of evidence) is that there is no common-law tradition of immunity for it, whether performed by a police officer or prosecutor. The reason that we grant it for the latter function (malicious prosecution) is that we have found a common-law tradition of immunity for a prosecutor's decision to bring an indictment, whether he has probable cause or not."). The decision to offer a plea bargain is necessarily a vital part of the judicial phase of the criminal process. *See Hike*, 427 N.W.2d at 160 (collecting cases for the proposition that a prosecutor's actions in the plea bargain process are absolutely immune). Similarly, "[t]he decision whether to call or not to call a given witness clearly falls within the scope of the immunity." *Beck*, 685 N.W.2d at 644 n.3; *see Imbler*, 424 U.S. at 426–27, 96 S. Ct. at 993 (stating absolute immunity insulates prosecutors from liability for calling witnesses who falsely testify). Likewise, the prosecutors' evaluation of the evidence is immune from legal challenge. *See Buckley*, 509 U.S. at 273–75, 274 n.5, 113 S. Ct. at 2615–17, 2616 n.5 (holding that prosecutor would be entitled to only qualified immunity for fabrication of evidence during the investigative phase prior to the development of probable cause and stating prosecutor's evaluation of evidence in trial is protected by absolute immunity).

The sole instance of alleged conduct falling outside the judicial process immunity is Venckus's allegation the Johnson County Attorney's

Office filed an ethics complaint against Venckus's attorney for conduct in a different case solely to bully Venckus's attorney and distract him from the defense of the case. The filing of an ethics complaint against an attorney is not "intimately associated with the judicial phase of the criminal process." *Beck*, 685 N.W.2d at 645. For example, in *Beck* we held a prosecutor was not entitled to absolute immunity for writing letters to the police department and the mayor regarding a case. *Id.* at 644–45. The prosecutor in *Beck* was performing an "administrative function" and not acting in his capacity as an advocate within the judicial process and thus was not entitled to absolute immunity. *Id.* Similarly, although the nature of the ethics complaint is not in the record, the filing of the complaint was not within the judicial phase of the criminal process. Claims related to this allegation are not barred by the judicial process immunity.

C.

In sum, the district court erred in part in denying the prosecutor defendants' motion to dismiss. The judicial process immunity applies to both common law and state constitutional claims. The allegations in the petition against the prosecutor defendants were sufficiently specific to apply the judicial process immunity. The immunity bars all claims in the petition against the individual prosecutors and the county except for any claim relating to the ethics complaint filed against Venckus's attorney because that conduct was administrative in nature and not intimately associated with the judicial phase of the criminal process.

IV.

The police defendants also claim the district court erred in denying their motion to dismiss. The police defendants contend they are absolutely immune from suit. They also contend all claims against them are barred

by the relevant statute of limitations. Finally, they claim Venckus's state constitutional claims were disallowed because an adequate nonconstitutional remedy existed under the IMTCA. We address each contention in turn.

A.

Like the prosecutor defendants, the police defendants contend the judicial process immunity bars all claims asserted against them. The district court denied the police defendants' motion to dismiss on two grounds. With respect to the state constitutional claims, the district court appeared to hold that the judicial process immunity was not available and the police defendants could only assert the qualified-immunity defense set forth in *Baldwin*. With respect to the common law claims for defamation, malicious prosecution, and abuse of process, the district court held the claims were not sufficiently developed. The court directed the police defendants to raise their judicial-process-immunity defense again when the facts were more fully known. For the reasons set forth below, we conclude the district court erred in part in denying the police defendants' motion to dismiss.

Absolute immunity extends to police officer functions falling within the scope of the judicial process immunity, e.g., testifying as an ordinary witness. *Cf. Minor*, 819 N.W.2d at 397 (stating a social worker functioning as an ordinary witness is entitled to absolute immunity). As discussed above, this is true whether the claims arise under common law or under the state constitution. The district court erred in holding otherwise.

However, we cannot conclude the district court erred in denying the police defendants' motion to dismiss based on the judicial process immunity. Unlike the claims against the prosecutor defendants, the claims against the police defendants are not well defined. This is

evidenced by the fact the parties spend much of their appellate briefing arguing about the factual bases for the claims against the police defendants. Moreover, the legal bases for the constitutional claims are not at all developed. As the police defendants noted in their motion to dismiss, "it is unclear from Venckus's petition how Rich allegedly violated his right to equal protection or right to a fair trial and due process." At oral argument, Venckus's counsel could not articulate the legal bases for some of the state constitutional claims. While the failure to present a coherent, cognizable cause of action might be cause to seek a more specific statement or an independent ground to dismiss Venckus's claim, those issues are not raised on appeal. *See* Iowa R. Civ. P. 1.421(1)(*f*) (allowing for preanswer motion to dismiss for "[f]ailure to state a claim upon which any relief may be granted"); *id.* r. 1.433 ("A party may move for a more specific statement of any matter not pleaded with sufficient definiteness to enable the party to plead to it . . . .").

Ultimately, "[a] motion to dismiss a petition should only be granted if there is no state of facts conceivable under which a plaintiff might show a right of recovery." *Kingsway Cathedral v. Iowa Dep't of Transp.*, 711 N.W.2d 6, 7 (Iowa 2006). Here, the factual and legal bases for the claims against the police defendants are so vague as to be indeterminate—the immunity may or may not apply depending on the factual and legal bases for the claims. We will not piece through the petition and advance arguments the parties have not made. "Judges are not like pigs, hunting for [meritorious] truffles buried in [the record]." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). On the record presented, we believe an appropriate application of the functional analysis prohibits us from making a broad decision regarding the application of the judicial process immunity to the claims against the police defendants.

For this reason, we affirm the district court's denial of the motion to dismiss with respect to the police defendants' argument regarding the judicial process immunity.

B.

The police defendants contend Venckus's claims are time-barred by the IMTCA, Iowa Code chapter 670 (2018). Iowa Code section 670.5 provides,

> Except as provided in section 614.8, a person who claims damages from any municipality or any officer, employee or agent of a municipality for or on account of any wrongful death, loss, or injury within the scope of section 670.2 or section 670.8 or under common law shall commence an action therefor within two years after the alleged wrongful death, loss, or injury.

The district court appears to have denied the police defendants' limitations defense on the ground that further development of the record is necessary to meaningfully apply the limitations period. For the reasons expressed below, we conclude the district court erred in part.

Although frequently referred to as a statute of limitations, section 670.5 is a statute of creation. We explained this distinction in the seminal case of *Montgomery v. Polk County*:

> Chapter [670[2]] created a new right of action—one that was not available at common law nor available elsewhere by statutory authority, and therefore, while cases interpreting other limitation statutes are helpful, they do not control here. Truly chapter [670], and particularly the section which we are interpreting here, section [670.5], might be called a statute of creation, rather than a statute of limitation. The statute creates a new liability and provides for methods of enforcing the same, and by its terms fixes the time within which action for recovery may be commenced. It being a statute of creation, *the commencement of the action within the time the statute fixes*

---

[2]The IMTCA was moved from Iowa Code chapter 613A to Iowa Code chapter 670 by the Code editor in 1993.

> *is an indispensable condition of the liability and of the action permitted.* The time element is an inherent element of the right so created, and the limitation of the remedy is likewise a limitation of the right.

278 N.W.2d 911, 914–15 (Iowa 1979) (en banc) (quoting *Sprung ex rel. Sprung v. Rasmussen,* 180 N.W.2d 430, 433 (Iowa 1970)). With that understanding, we held the time to file the action commenced upon the date of injury and not the date of accrual. *See id.* at 916–17.

Since *Montgomery* was decided in 1979, we have repeatedly held the IMTCA bars any claim not filed within the requisite time period as measured from the date of injury rather than date of accrual. *See Rucker v. Humboldt Cmty. Sch. Dist.,* 737 N.W.2d 292, 294 (Iowa 2007) ("[The IMTCA's statute of limitations] requires a plaintiff to file suit within two years from the date of injury."); *Callahan v. State,* 464 N.W.2d 268, 270 (Iowa 1990) (en banc) (holding the limitations period under the Iowa Tort Claims Act commences from the date of accrual in contrast with the IMTCA, which commences on the date of injury without regard to when the claim accrues); *Uchtorff v. Dahlin,* 363 N.W.2d 264, 266 (Iowa 1985) (en banc) (refusing to overrule *Montgomery* because the time period for commencing an action is governed by statute and the statute provides the date of injury is the relevant date); *Orr v. City of Knoxville*, 346 N.W.2d 507, 510 (Iowa 1984) (en banc) (adhering to rejection of the discovery rule); *Farnum ex rel. Farnum v. G.D. Searle & Co.,* 339 N.W.2d 392, 396 (Iowa 1983) (en banc) ("The trial court in the present case predicted that, upon reconsideration, a majority of this court would now vote to overrule *Montgomery* and adopt the view of the dissenters in that case. This prediction is incorrect. The court adheres to the holding in *Montgomery* . . . .").

Most recently, in *Doe v. New London Community School District*, we again held the limitations period in section 670.5 commences on the date of injury. 848 N.W.2d 347, 353–54 (Iowa 2014). We explained, "[T]he IMTCA contains no term like 'accrues' to give the statute 'elasticity' for the court to consider 'when a cause of action 'accrues.'" *Id.* at 352 (quoting *Montgomery*, 278 N.W.2d at 914). We further noted the legislature amended the statute post-*Montgomery* and retained the date of injury as the relevant date and there was thus no reason to reconsider *Montgomery*:

> In sum, on several occasions, we have discussed the pre–2007 version of section 670.5 and said it did not incorporate a common law discovery rule. We reached this conclusion based upon the absence of language like "accrue" or "accrual" in the IMTCA to suggest that something other than the date of injury might be the starting point for the statute of limitations. Especially given the further fact that section 670.5 has now been legislatively rewritten, we see no reason to disturb our longstanding precedent in this area.

*Id.* at 353–54 (citations omitted). One of the practical consequences of *Montgomery*, as reaffirmed in *Doe*, is that an action can be barred before the accrual date if the action was not filed within two years of the date of injury. *See Farnum*, 339 N.W.2d at 394, 396 (holding an action was barred by the limitations period where the time period to commence the action had passed prior to the accrual date).

Venckus does not contest the timeliness of his common law claims is governed by section 670.5, but he does dispute whether his state constitutional claims are governed by section 670.5. With respect to his constitutional claims, Venckus contends Iowa Code section 614.1(2) applies. That section provides for a two-year statute of limitations. Iowa Code § 614.1(2). However, that two-year limitations period commences on the date of accrual rather than injury and is subject to the discovery rule. *See id.* § 614.1. We disagree with Venckus's contention.

Claims arising under the state constitution are subject to the IMTCA. Iowa Code section 670.2(1) provides a "municipality is subject to liability for its torts and those of its officers and employees." Iowa Code section 670.1(4) defines a "tort" as "every civil wrong," including the "denial or impairment of any right under any constitutional provision." Section 670.4(2) provides the statutory remedies shall be exclusive. Our cases recognize the exclusivity of the IMTCA. *See, e.g., Rucker*, 737 N.W.2d at 293 ("Iowa Code chapter 670 is the exclusive remedy for torts against municipalities and their employees."). Thus, the limitations period set forth in section 670.5 applies here.

Venckus contends we should ignore the text of the statute because application of the limitations period set forth in section 670.5 creates inconsistency in the law regarding the time to file constitutional claims against the state and its municipalities. Venckus notes constitutional claims against the state must be asserted within two years of the date the claim accrues, *see* Iowa Code § 669.13(1), whereas, under section 670.5, a claim must be filed within two years of the date of injury.

We are nonplussed regarding the distinction between the two limitations periods. We have long recognized and upheld the distinction between the two limitations periods. The legislature has placed greater limitations on actions against municipalities compared to actions against the state because municipalities "operate under greater fiscal constraints than the state does" and municipalities have special problems with respect to formulating and implementing budgets. *Farnum*, 339 N.W.2d at 397. More than thirty-six years have passed since *Farnum*, and the legislature has continued to distinguish between claims against the state and municipalities. Venckus's purported inconsistency is actually a legislative

policy decision of long standing. We see no reason to disturb the legislature's decision.

With that background, we apply the IMTCA to the claims presented. We first consider whether the IMTCA bars Venckus's claim for defamation. "To establish a prima facie case in a[] defamat[ion] action, a plaintiff must show the defendant (1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Bierman v. Weier*, 826 N.W.2d 436, 464 (Iowa 2013) (second alteration in original) (quoting *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996)). The date of injury for a defamation claim is the date on which "the defendants performed their last allegedly . . . defamatory act." *Crouse v. Iowa Orthopaedic Ctr.*, No. 03-1626, 2005 WL 1224577, at *4 (Iowa Ct. App. May 25, 2005). The only statement attributable to the police defendants is the statement made in conjunction with Venckus's arrest. The petition was filed more than four years after that statement. We thus conclude section 670.5 bars Venckus's defamation claim.

With respect to the remainder of Venckus's claims, we agree with the district court that the record is not adequate to evaluate the limitations defense. "A defendant may raise the statute of limitations by a motion to dismiss if it is obvious from the uncontroverted facts contained in the petition that the applicable statute of limitations bars the plaintiff's claim for relief." *Turner v. Iowa State Bank & Tr. Co. of Fairfield*, 743 N.W.2d 1, 5 (Iowa 2007). Where the nature of the claim or the pertinent factual allegations are unclear, further development of the record may be necessary. *See id.* With the exception of the defamation claim discussed above, the same difficulties precluding resolution of the police defendants' absolute-immunity argument preclude resolution of their limitations defense—namely, the factual and legal bases for the claims are

underdeveloped. We thus conclude the district court did not err in denying the motion to dismiss with respect to the remainder of the claims.

C.

The police defendants argue Venckus's state constitutional claims are not cognizable because the IMTCA allows for adequate remedies. Specifically the police defendants contend the IMTCA allows for jury trial, compensatory damages, and punitive damages. The district court concluded the IMTCA did not preempt Venckus's state constitutional claims.

We conclude the district court did not err in denying the police defendants' motion. The IMTCA "does not expand any existing cause of action or create any new cause of action against a municipality." Iowa Code § 670.4(3). Instead, the Act allows people to assert claims against municipalities, their officers, and their employees that otherwise would have been barred by the doctrine of sovereign immunity. *See Thomas v. Gavin*, 838 N.W.2d 518, 521 (Iowa 2013) (explaining the IMTCA abolished sovereign immunity). The substance of any legal claim asserted under the IMTCA must arise from some source—common law, statute, or constitution—independent of the IMTCA. The mere existence of the IMTCA itself does not provide any remedy that would preclude the recognition of a state constitutional claim. While there might be common law causes of action or statutory causes of action that would provide a remedy sufficient to warrant disallowance of the state constitutional claims, those arguments are not advanced here. Further, as noted above, the record with respect to Venckus's claims against the police defendants is not sufficiently developed to justify dismissal at this point.

For these reasons, the district court did not err in denying the police defendants' motion to dismiss on this ground.

D.

Finally, the police defendants argue a claim for malicious prosecution will not lie against the police defendants because (1) there was probable cause to charge Venckus and (2) the prosecutors had exclusive control of the case. The police defendants did not directly present the issue to the district court, and the district court did not directly rule on the issue. It is not preserved for appellate review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). Given that the issue was not directly presented to or decided by the district court, prudence dictates further development of the record. We need not address the issue further.

E.

In sum, we conclude the district court erred in part in denying the police defendants' motion to dismiss. The district court erred in concluding *Baldwin* displaced the judicial process immunity. The district court erred in denying the police defendants' motion to dismiss Venckus's defamation claim. The district court did not err in denying the police defendants' motion to dismiss on the remaining grounds.

V.

The district court erred in part in denying the defendants' respective motions to dismiss. We remand this matter for further proceedings not inconsistent with this opinion. We express no view on the merits or demerits of the claims, immunities, defenses, or other issues to be litigated after remand and upon development of the record.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Appel, J., who dissents.

#18–1280, *Venckus v. City of Iowa City*

**APPEL, Justice (concurring in part and dissenting in part).**

### I. Introduction.

After being acquitted by a jury of a rape charge, Joshua Venckus alleges that police and prosecutors recklessly ignored evidence proving he was innocent, improperly engaged in expert shopping after a state criminologist provided them with an unfavorable opinion, filed an ethics complaint against Venckus's attorney over an unrelated matter that state authorities ultimately dismissed, threatened one of Venckus's alibi witnesses if he did not change his testimony, and offered the actual rapist a lenient plea deal in order to obtain testimony against Venckus. Venckus claims the defendants' actions and omissions amounted to numerous violations of his rights under the Iowa Constitution. He seeks to vindicate these constitutional rights in an Iowa courtroom.

The various defendants filed a motion to dismiss the complaint, alleging a number of grounds including the claim that they were absolutely immune from the claims brought by Venckus. The district court granted the motion. On reconsideration, the district court denied in entirety the defendants' motions to dismiss. The defendants appealed.

The question before us is whether Venckus is entitled to his day in court or whether the doors of the courthouse are closed to his claims. For the reasons expressed below, I conclude that absolute immunity should not bar his claims. As a result, I dissent from division III of the majority opinion.

### II. Factual and Procedural Background.

**A. Factual Background.** The petition filed by Venckus alleged the following facts. Because we are reviewing a motion to dismiss, we accept

the facts as true. *Albrecht v. Gen. Motors Corp.*, 648 N.W.2d 87, 89 (Iowa 2002).

In February 2013, Venckus was visiting Chicago. While he was in Chicago, his roommates in Iowa City had a party. A woman at the party became intoxicated and slept on the couch. Other partygoers made her comfortable and covered her with a blanket retrieved from Venckus's bedroom.

A man named Ryan Markley was one of the attendees at the party. After the party, Markley broke into the residence and sexually assaulted the woman. The victim was able to escape and sought help from a person in the alley by the back door of the residence.

The person assisting the victim saw one person at the back door of the residence as the woman escaped. The police were called. Police found Markley's wallet outside a window well of the residence, Markley's handprint on the north window used to enter the residence, and Markley's boot imprint on a chair inside the window where entry was gained to the basement of the residence.

Police interviewed the victim, Venckus's roommates, and Venckus himself. All explained that Venckus was in Chicago at the time of the crime. No one placed Venckus at the house during the party.

Officer Rich was principally responsible for the investigation. Police initially focused on Markley as the perpetrator. The results of DNA testing returned male profiles for two persons, Markley and an unknown male. The profile of the unknown male consisted of one sperm found in the victim's cervix. The police obtained a DNA sample from Venckus and found his DNA matched the sperm.

Prior to his arrest, Venckus tried to prove his alibi. He gave police his bank card and cell phone, and offered to provide contact information

for people who could attest that he was in Chicago. The defendants pressed forward despite overwhelming evidence that Venckus was in Chicago at the time of the assault.

In January 2014, eleven months after the sexual assault, police charged both Venckus and Markley for the sexual assault. Prior to the filing of criminal charges, Venckus did not know Markley. Venckus pled an alibi defense. Johnson County prosecutors Anne Lahey, Naeda Elliott, and Dana Christiansen were involved in the prosecution.

Officer Rich interviewed Michael Concannon, one of the plaintiff's alibi witnesses. In the course of a recorded interview, Rich threatened him with prosecution if he did not change his testimony to implicate Venckus. Venckus's petition alleged that the act would constitute tampering with a witness.

Beginning on August 20, 2015, and continuing up until trial, Venckus's attorney created a Google Drive online file. Venckus's defense attorney placed into the Google Drive all of the evidence that Venckus was relying upon to show that Venckus was not in Iowa at the time of the crime and that the DNA evidence relied upon was not reliable.

The Google Drive was shared with the defendants upon its creation. Venckus's attorney would periodically update the file and notify the defendants that it had been updated. The Google Drive was updated and maintained up until the time of trial in September 2016. Venckus alleged that the defendants either failed to review the information provided on the Google Drive or recklessly and with malice ignored the information. Venckus alleged, "Despite the overwhelming evidence that Plaintiff could not have been the perpetrator and the clear evidence that Ryan Lee Markley was the sole perpetrator, the Defendants continued their reckless crusade to convict an innocent man of this awful crime."

Venckus's attorney also shared expert witness reports on the single sperm found in the victim's cervix that matched Venckus's DNA. The reports were provided to establish that the DNA evidence of one sperm found in the cervix represented evidence of a transfer from the blanket covering the victim and could not represent the sole evidence of DNA left by a rapist.

Defendants were told by DCI criminologist Michael Halverson, the DNA technical leader at the Iowa Department of Criminal Investigation (DCI), that it was possible that dry sperm, if rehydrated, could transfer from the blanket. The defendants then withdrew Halverson as an expert witness and pressured DCI criminologist Tara Scott, who was supervised by Halverson, to offer an opinion that a transfer was not possible. Venckus alleged the defendants' "expert shopping" was done because Venckus's lawyer had provided "a reasonable explanation for why only *one sperm* could be found in the body of the victim when the donor was 240 miles away."

During the prosecution, Venckus alleges that defendants' pursuit of him "was so reckless that they even agreed to offer a more lenient plea to the actual rapist, Ryan Lee Markley" in return for testimony against Venckus. But at trial, Markely was not called as a witness because, according to Venckus, "Markley did not have any evidence that Plaintiff had been involved in this terrible assault."

During the pendency of the prosecution of Venckus, the Johnson County Attorneys' Office filed an ethics complaint against Venckus's criminal defense attorney dealing with events in an unrelated case that was three months old. Venckus alleged the ethics complaint was filed "in order to distract his attorney from preparing for trial or to force the withdrawal of said attorney." The ethics complaint was eventually

dismissed by the Iowa Supreme Court Attorney Disciplinary Board in July 2017 upon a finding of no convincing proof of ethical misconduct.

According to Venckus, the defendants "knew that their effort to convict Plaintiff would likely fail but pressed forward because they knew they had made a mistake in charging the Plaintiff and they did not want to make such an admission."

After a criminal trial in September 2016, a jury acquitted Venckus. Venckus alleged that as a result of the above, he incurred substantial attorney's fees, suffered significant emotional distress, was expelled from college, lost a career, and endures continuous harm to his reputation.

**B. Procedural History.** Venckus brought suit in March 2018 against Officer Rich and Iowa City (city defendants) and against Johnson County. He filed an amended petition in April 2018, adding prosecutors Lahey, Elliott, and Christiansen (together with Johnson County, county defendants).

Venckus asserted *Godfrey* claims against all defendants for violations of his constitutional rights. *See Godfrey v. State*, 898 N.W.2d 844, 847 (Iowa 2017). The claimed violations involve (1) search and seizure, Iowa Const. art. I, § 8; (2) due process and a fair trial, *id.* art. I, § 9; (3) equal protection, *id.* art. I, § 6; and (4) liberty and freedom of movement and association, *id.* art. I, § 1. Venckus also asserted that all defendants committed abuse of process. As to the city defendants, Venckus additionally alleged defamation and malicious prosecution. The city defendants and the county defendants moved to dismiss the petition.

In their motion to dismiss, the city defendants raised a number of defenses. As to all claims, city defendants sought dismissal based on (1) absolute prosecutorial or witness immunity and (2) statute of limitations. As to the *Godfrey* claims, city defendants also asserted failure

to state a claim because the Iowa Municipal Tort Claims Act (IMTCA) provides an adequate remedy. *See* Iowa Code ch. 670. They further contended that the *Godfrey* claims against Iowa City should be dismissed because there is no direct cause of action against municipal entities under the Iowa Constitution.

County defendants filed a more limited motion to dismiss. They sought dismissal on the basis of the defense of absolute prosecutorial immunity. The county defendants did not argue that the IMTCA provides an adequate remedy.

In June, the district court largely granted the motions to dismiss. The district court dismissed all the claims against the county defendants based on absolute prosecutorial immunity. On the *Godfrey* claims against the city defendants, the district court stated that the punitive damages available in the IMTCA, *see* Iowa Code § 670.12, rendered the *Godfrey* claims "unnecessary and duplicative." The district court also dismissed the claims for defamation and abuse of process against the city defendants as time-barred under Iowa Code section 670.5. The district court did not dismiss the malicious prosecution claim against the city defendants but expressed uncertainty as to whether Venckus would be able to prove the claim. Still, the court limited city defendants' exposure to the malicious prosecution claim. The court held Officer Rich was entitled to qualified immunity in his capacity as a complaining witness and police officer, and absolute immunity for his role in testifying at trial or preparing for trial. These immunities, the court held, also applied to Iowa City.

Venckus asked the district court to reconsider. Venckus supplemented his reconsideration request after we decided *Baldwin v. City of Estherville* (*Baldwin II*), 915 N.W.2d 259, 281 (Iowa 2018).

The district court reversed itself and denied the motions to dismiss. According to the district court, Officer Rich and the prosecutors were entitled to qualified immunity under *Baldwin II*. Further, in light of *Baldwin II*, the district court held "the IMTCA does not pre-empt the constitutional claims provided for in *Godfrey*." The district court also held that the determination of whether Johnson County and Iowa City were entitled to immunity for abuse of process should be made after discovery. Likewise, the defamation claim against city defendants was reinstated to allow Venckus the opportunity to discover facts concerning defamatory actions that were not time-barred. And the malicious prosecution claim against city defendants was also reinstated until after discovery.

Defendants applied for interlocutory appeal. We granted the applications.

### III. Standard of Review.

"[W]e review a district court's ruling on a motion to dismiss for correction of errors at law." *Turner v. Iowa State Bank & Tr. Co. of Fairfield*, 743 N.W.2d 1, 2–3 (Iowa 2007). We may grant a motion to dismiss for "[f]ailure to state a claim upon which any relief may be granted." Iowa R. Civ. P. 1.421(1)(*f*).

"In determining whether to grant the motion to dismiss, a court views the well-pled facts of the petition in the light most favorable to the plaintiff, resolving any doubts in the plaintiff's favor." *Turner*, 743 N.W.2d at 3. "The purpose of the motion is to test the legal sufficiency of the petition." *Id.*

### IV. Immunities and the Iowa Constitution.

Although there is no need to repeat what I have already said in *Baldwin II*, we need to be clear-eyed about what is at stake in this case. As was noted by Chief Justice John Marshall at the founding of our

republic, "[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (quoting 3 William Blackstone, *Commentaries on the Laws of England* 23 (1765–1769) [hereinafter Blackstone]).

Make no mistake, the right-without-a-remedy issue is the front and center issue in this case. The stakes are high. On the one hand, we are dealing with the awesome prosecutorial power of the state. On the other hand, we are dealing with fundamental rights asserted in the very first article of the Iowa Constitution.

In my view, we should be resistant and skeptical, maybe even stubborn, about any assertions of immunity in cases involving a constitutional tort. As will be shown below, absolute prosecutorial immunity historically was simply not available. It is a modern innovation in the law supported by a highly questionable policy rationale. And its consequence is unnerving: It closes the courthouse door to grievances related to profound constitutional harms.

Further, the majority of this court in *Baldwin II* has already developed a doctrine of qualified immunity for the officers and agents of the state. I would apply the constitutional brakes in this case and bring the development of immunities for constitutional torts to a stop.

**V. Absolute Prosecutorial Immunity from Constitutional Torts.**

**A. Absolute Judicial Immunity at Common Law.** At common law, absolute judicial immunity protected judges acting in their judicial functions. *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 1217–18 (1967); *Floyd v. Barker* (1607) 77 Eng. Rep. 1305, 1307; J. Randolph Block, Stump v. Sparkman *and the History of Judicial Immunity*, 1980 Duke L.J. 879, 897–901 [hereinafter Block] (collecting early American

authorities). It also extended to "jurors and grand jurors, members of courts-martial, private arbitrators, and various assessors and commissioners." *Kalina v. Fletcher*, 522 U.S. 118, 132, 118 S. Ct. 502, 510 (1997) (Scalia, J., concurring).

Absolute judicial immunity was a limited doctrine. It "extended only to individuals who were charged with resolving disputes between other parties or authoritatively adjudicating private rights." *Id.*

Absolute immunity of the judicial function was based on the public interest in allowing a neutral decision-maker to exercise his function with independence. *Pierson*, 386 U.S. at 554, 87 S. Ct. at 1218. The judge must "*decide* all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants." *Id.* (emphasis added). Moreover, "[h]is errors may be corrected on appeal." *Id.* "[T]he doctrine of judicial immunity was developed primarily to eliminate collateral attacks on judgments and to confine procedures in error to the hierarchy of the king's courts . . . ." Block, 1980 Duke L.J. at 880.

**B. No Absolute Prosecutorial Immunity at Common Law for Common Law Torts.** In evaluating the status of prosecutorial immunity at common law, we need to recognize that the prosecutorial function at common law in early America and also in England involved both public and private prosecutors. John D. Bessler, *The Public Interest and the Unconstitutionality of Private Prosecutors*, 47 Ark. L. Rev. 511, 516–18 (1994); *see State v. Peterson*, 218 N.W. 367, 369 (Wis. 1928).

In Iowa, public prosecutors have worked alongside private prosecutors since before the 1857 constitutional convention. At the constitutional convention, Mr. Harris noted that, oftentimes, private prosecutors were employed to initially present a case to a magistrate, after

which they "let the matter go into court, when the State will take charge of it. They look to the prosecuting attorney to take charge of it in the courts." 1 *The Debates of the Constitutional Convention of the State of Iowa* 476 (W. Blair Lord rep., 1857), www.statelibraryofiowa.org/services/ collections/law-library/iaconst. The framers discussed the ineptitude of some county attorneys and debated whether district attorneys would be preferable. *Id.* at 475–77. Mr. Harris noted that the people of his district "desired only to see the law faithfully executed," *id.* at 476, while Mr. Gillaspy emphasized that incompetent public prosecutors had cost the state enough "to build a railroad from one end of the State to the other," *id.* at 477.

Across the country, both public and private prosecutors were subject to suit for misconduct. Private prosecutors could be sued for malicious prosecution where, for instance, they caused wrongful imprisonment or induced the seizure of property. *Warfield v. Campbell*, 35 Ala. 349, 350 (1859); *Burnap v. Marsh*, 13 Ill. 535, 538–39 (1852); *Center v. Spring*, 2 Iowa 393, 401, 404 (1856); *Wood v. Weir*, 44 Ky. 544, 546, 550 (1845); *Staley v. Turner*, 21 Mo. App. 244, 251–52 (Ct. App. 1886). This court said, for example, that "[t]he prosecution of an innocent person without using reasonable care to ascertain the facts is certainly not justifiable." *Walker v. Camp*, 63 Iowa 627, 630, 19 N.W. 802, 803 (1884).

Public prosecutors were also subject to suit for malicious prosecution. In *Parker v. Huntington*, 68 Mass. 124, 128 (1854), the Massachusetts Supreme Judicial Court held that a public prosecutor who elicited and used false testimony could be liable for malicious prosecution. Additionally, "in 1871, the Reconstruction Congress adopted § 1983 in part to address the abusive practice in the South of prosecuting Union officers and officials who were attempting to establish and enforce civil

rights for newly freed slaves." Margaret Z. Johns, *Unsupportable and Unjustified: A Critique of Absolute Prosecutorial Immunity*, 80 Fordham L. Rev. 509, 510, 525 (2011) [hereinafter Johns, *Unsupportable and Unjustified*].

The absence of absolute prosecutorial immunity in those cases is explained by two considerations. First, the courts refused to privilege finality and prosecutorial freedom over redress for the injuries to a defendant and safeguards for public trust of the justice system. As one court explained,

> It would be strange . . . if the attorney, by art and contrivance, the abuse of the confidence reposed, and prostitution of his profession, should *procure* from the Justices, from *malicious motives* to the defendant, an illegal and oppressive order by which injury accrues to the defendant, if the attorney could not be made liable for the wrong. It is contended, that *this rule* will expose attorneys to perplexing litigation, to the manifest injury of the profession. If it should, the law knows no distinction of persons; a different rule cannot, as to them, be recognized by this Court, from that which is applicable to others. Besides, this is a numerous class, powerful for good or evil, and holding them to a strict accountability, will have the effect to exalt and dignify the profession, by purging it of ignorant, meretricious and reckless members.

*Wood*, 44 Ky. at 547.

Second, the tort of malicious prosecution incorporated elements akin to a qualified immunity. In general, a person could be sued for malicious prosecution "only if he acted maliciously and without probable cause, and the prosecution ultimately terminated in the defendant's favor." *Kalina*, 522 U.S. at 132–33, 118 S. Ct. at 511; *see* Margaret Z. Johns, *Reconsidering Absolute Prosecutorial Immunity*, 2005 BYU L. Rev. 53, 111 (2005) [hereinafter Johns, *Reconsidering Absolute*]; *see also Center*, 2 Iowa at 406–07 ("To sustain this action, . . . plaintiff must show that the prosecution originated in the malice of the prosecutor, and

without probable cause."). "[T]here was a kind of qualified immunity built into the elements of the tort." *Kalina*, 522 U.S. at 133, 118 S. Ct. at 511.

**C. Emergence of Absolute Immunity for Prosecutorial Functions.**

1. *Turn-of-the-century developments.* Public prosecutors remained subject to suit in many states well into the twentieth century. In *Arnold v. Hubble*, 38 S.W. 1041, 1041 (Ky. 1897), the court suggested that a public prosecutor could be liable for malicious prosecution if acting with malicious or corrupt motives. In *Carpenter v. Sibley*, 94 P. 879, 879–80 (Cal. 1908), the California Supreme Court held that a public prosecutor and a sheriff were subject to suit for malicious prosecution for the use of false testimony. In *Buhner v. Reusse*, 175 N.W. 1005, 1006 (Minn. 1920), the Minnesota Supreme Court explained that an action for malicious prosecution against a public prosecutor required plaintiff to prove both malice and want of probable cause.

In *Leong Yau v. Carden*, 23 Haw. 362, 368 (1916), the Hawaii court held that public prosecutors are immune from suits based on actions "done in good faith though with erroneous judgment, but private individuals are entitled to the protection of the law against any conduct of such officers which is at once reckless, malicious and damaging." The *Leong Yau* court specifically rejected the notion that public prosecutors act in a judicial function, explaining,

> Public prosecuting officers are, properly speaking, executive officers. Though, like all enrolled attorneys, they are officers of the courts, they are not part of the courts. In discharging their duties executive officers are at times required to perform acts of a judicial nature, but even then they act no more than quasi-judicially.

*Id.* at 367.

Finally, in *Schneider v. Shepherd*, 158 N.W. 182, 184 (Mich. 1916), the Michigan Supreme Court held that a public prosecutor's instigation of arrest did not even warrant the immunity of a quasi-judicial officer. The court noted that the prosecutor prosecuted criminal charges based on vague investigative reports, without further inquiry, that did not connect the criminal defendant with the alleged crime. *Id.*

At the turn of the twentieth century, there were also decisions holding prosecutors absolutely immune from suit for malicious prosecution. The first case anywhere was in Indiana. *See Griffith v. Slinkard*, 44 N.E. 1001, 1002 (Ind. 1896); *see* Johns, *Reconsidering Absolute*, 2005 BYU L. Rev. at 114. The *Griffith* court held that a public prosecutor is a judicial officer, not in the sense of a judge but insofar as he performs judicial duties requiring exercise of judgment, and is therefore entitled to absolute immunity. 44 N.E. at 1002.

In *Smith v. Parman*, 165 P. 663, 663 (Kan. 1917), the Kansas Supreme Court recognized that much of a public prosecutor's work is advocacy. However, because "the important matter of determining what prosecutions shall be instituted is committed in a considerable degree to his sound judgment," the court held that "the reason for granting immunity to judges and grand jurors applies with practically equal force to a public prosecutor in his relations to actions to punish infractions of the law." *Id.* The court reasoned that absolute immunity would not foster abuse of power because of "the risk of being called to account criminally for official misconduct." *Id.* at 663–64.

In *Kittler v. Kelsch*, 216 N.W. 898, 898 (N.D. 1927), a public prosecutor was sued after he made out a criminal complaint and brought criminal charges based on false information. The court held that the prosecutor's action was state action and constituted a judicial mistake to

which absolute immunity applied. *Id.* at 904. This immunity, the court said, was "for the protection of the public, and to insure the active and independent action of the officers charged with the prosecution of crime, for the protection of life and property." *Id.* at 905. In a dissent, Justice Burr argued that a prosecutor should be immune from "passing upon complaints" but not from "making the complaint himself." *Id.* (Burr, J., dissenting).

In *Watts v. Gerking*, 228 P. 135, 141 (Or. 1924), a majority of the Oregon Supreme Court sustained a demurrer of a complaint for malicious prosecution against a public prosecutor. The majority said, "Because of their tendency to obstruct the administration of justice, it is the policy of the law to discourage actions for malicious prosecution." *Id.* Noting that a public prosecutor is subject to criminal sanctions, the majority further stated, "The public policy of the state affords ample protection to the innocent, and a prosecutor's endeavors should not be weakened by backfires in the nature of malicious prosecution." *Id.*

Two Justices dissented. Justices Burnett and Rand emphasized that a prosecutor should not be immune from civil suit when he prosecuted a person the prosecutor knew to be innocent of the charges. *Id.* at 142 (Burnett, J., dissenting); *id.* at 143–44 (Rand, J., dissenting). Justice Burnett explained,

> In this government of the people, by the people, for the people, no officer is clothed with arbitrary, autocratic, or irresponsible power with which he may knowingly oppress an innocent person. I fully agree with the principle that any judicial officer, district attorney, or grand juror, while acting within the scope of his authority, is protected from either civil or criminal liability, though his actuating motive may be malicious. He may depend upon testimony of witnesses if he has no knowledge of nor reason to suspect its want of truth although the event may demonstrate its falsity. But when, as charged in the complaint herein, he knows that the charge he promotes is false, he has no right to seize upon some isolated

inconclusive circumstance and institute a prosecution upon it. It is the scienter that strips from him the immunity of his official station. A person whom the district attorney knows to be innocent is not one of those within his jurisdiction to prosecute. When he has actual knowledge of innocence he cannot have reasonable cause to believe guilt. Only a person who is an actual violator of the law or whom the district attorney has reasonable cause to believe is such violator is amenable to prosecution by that officer. All others are beyond the pale of his authority, and as to them when he knows they are guiltless he acts at his peril, for there can be no wrong without a remedy.

*Id.* at 142 (Burnett, J., dissenting). Justice Rand went further, articulating that public policy dictates a public prosecutor should be entitled to no more than the type of qualified immunity we found in *Baldwin II*, 915 N.W.2d at 260–61:

As the defendant was a prosecuting officer, if the act had been done either ignorantly or rashly, for doing it, the law might hold him excusable. But as the act was done wickedly, with full knowledge of its falsity, the doing of the act, in law, was neither justifiable nor excusable, and the defendant ought to be compelled to answer for the consequences of his wrongful act. . . . To contend, under any proper conception of sound public policy, that any prosecuting officer has the privilege of bringing a person into court and charging him with and prosecuting him for a crime which he knows him to be innocent of, without being answerable for the damages caused thereby, upon the theory that the public good will be best subserved thereby, is a proposition too monstrous to be debated in a court of justice; for it must be obvious to any reasonable mind that this would place in the hands of an unscrupulous officer powers which are not consistent with good government nor the welfare of society.

228 P. at 144 (Rand, J., dissenting).

2. *Current status of absolute prosecutorial immunity.* Jurisdictions across our country remain divided on whether prosecutors are entitled to absolute immunity.

To be sure, the greater weight of modern precedent affords absolute immunity to prosecutorial functions. *See Knapper v. Connick*, 681 So. 2d 944, 946 n.8 (La. 1996) (collecting authorities); George A. Weiss,

*Prosecutorial Accountability After* Connick v. Thompson, 60 Drake L. Rev. 199, 231 & n.231 (2011) (same); *see also* Restatement (Second) of Torts § 656, at 414 (Am. Law Inst. 1977) ("A public prosecutor acting in his official capacity is absolutely privileged to initiate, institute, or continue criminal proceedings.").

The United States Supreme Court has held prosecutors absolutely immune to common law torts and § 1983 actions.  In *Yaselli v. Goff*, 275 U.S. 503, 48 S. Ct. 155 (1927) (per curiam), in a one-sentence opinion, the Supreme Court of the United States affirmed a lower court decision holding public prosecutors absolutely immune from a civil action for malicious prosecution.  The *Yaselli* Court cited its decisions upholding absolute immunity of judges.  *Id.*; *see Alzua v. Johnson,* 231 U.S. 106, 111, 34 S. Ct. 27, 29 (1913); *Bradley v. Fisher*, 80 U.S. 335, 347 (1871).

The Court's decisions on absolute prosecutorial immunity in § 1983 actions began in 1976.  *See Imbler v. Pachtman*, 424 U.S. 409, 431, 96 S. Ct. 984, 995 (1976).  In short, the Court has determined that a prosecutor is entitled to absolute immunity when functioning as an advocate and qualified immunity when functioning as an administrator or investigator.  *Id.* at 430–31, 96 S. Ct. at 995; *see Van de Kamp v. Goldstein*, 555 U.S. 335, 338–39, 129 S. Ct. 855, 858–59 (2009); *Kalina*, 522 U.S. at 129–31, 118 S. Ct. at 509–10 (majority opinion); *Buckley v. Fitzsimmons*, 509 U.S. 259, 261, 275–76, 113 S. Ct. 2606, 2609, 2617 (1993); *Burns v. Reed*, 500 U.S. 478, 494–96, 111 S. Ct. 1934, 1943–44 (1991).

In addition, the majority tells us, federal circuit courts of appeal unanimously hold that the judicial process immunity applies to federal constitutional claims brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971).  That result is not surprising.  Federal courts generally apply § 1983

precedent to *Bivens* claims. *See Butz v. Economou*, 438 U.S. 478, 504, 98 S. Ct. 2894, 2909–10 (1978). In fact, all of the cases cited by the majority that actually deal with absolute prosecutorial immunity in *Bivens* actions rely on *Imbler* or its § 1983 progeny. *See Humphries v. Houghton*, 442 F. App'x 626, 628–29, 629 n.5 (3d Cir. 2011) (per curiam); *Rodriguez v. Lewis*, 427 F. App'x 352, 353 (5th Cir. 2011) (per curiam); *Pangelinan v. Wiseman*, 370 F. App'x 818, 819 (9th Cir. 2010); *Nogueras-Cartagena v. U.S. Dep't of Justice*, 75 F. App'x 795, 798 (1st Cir. 2003) (per curiam); *Blakely v. United States*, 276 F.3d 853, 871 (6th Cir. 2002); *Benson v. Safford*, 13 F. App'x 405, 407 (7th Cir. 2001); *Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000) (per curiam); *Lyles v. Sparks*, 79 F.3d 372, 376 (4th Cir. 1996); *Thompson v. Walbran*, 990 F.2d 403, 404–05 (8th Cir. 1993) (per curiam); *Daloia v. Rose*, 849 F.2d 74, 75 (2d Cir. 1988) (per curiam); *Tripati v. U.S. Immigration & Naturalization Serv.*, 784 F.2d 345, 347 (10th Cir. 1986) (per curiam).

Some states have departed from the majority and limit or deny absolute prosecutorial immunity. In *Cashen v. Spann*, 334 A.2d 8, 10, 12 (N.J. 1975), the New Jersey Supreme Court distinguished prosecutorial immunity from judicial immunity and held the former was not absolute. The *Cashen* court reviewed a lower state court decision finding "[n]o rationalization could possibly shield evil acts of such magnitude" as the subornation of perjury involved in the reviewed case. *Id.* at 13 (quoting *DeGroot v. Muccio*, 277 A.2d 899, 907 (N.J. Super. Ct. Law Div. 1971)). The *Cashen* court concluded that "there are indeed circumstances in which a prosecutor will incur civil liability for his official conduct" and "[t]he public interest is best served by recognizing that prosecutors enjoy only a limited form of immunity." *Id.*

The *Cashen* court did not consider the contours of prosecutorial immunity because it found the record "d[id] not support any inference that the prosecutor in this case acted out of personal motive, with malicious intent, or in excess of his jurisdiction." *Id.* at 14. In a subsequent case, the New Jersey Supreme Court explained that "reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, . . . affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Burke v. Deiner*, 479 A.2d 393, 397 (N.J. 1984) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S. Ct. 1683, 1692 (1974), *abrogated on other grounds by Davis v. Scherer*, 468 U.S. 183, 191, 104 S. Ct. 3012, 3017 (1984)). *Cashen* remains the law in New Jersey. *See, e.g., Pitman v. Ottehberg*, No. 10-2538, 2015 WL 179392, at *9 (D.N.J. Jan. 14, 2015) (recognizing continuing vitality of *Cashen*); *Newsome v. City of Newark*, No. 13-CV-06234, 2014 WL 4798783, at *4 (D.N.J. Sept. 25, 2014) (same).

Public prosecutors acting in a prosecutorial function are also subject to suit in Nebraska. In *Koch v. Grimminger*, 223 N.W.2d 833, 836 (Neb. 1974), the Nebraska Supreme Court relied on the common law notion of quasi-judicial immunity. The *Koch* court said that, in determining whether to file a complaint, the prosecutor must ascertain the law, apply the law to the facts, and weigh the reliability of evidence, all of which constitute quasi-judicial and discretionary functions. *Id.* at 836–37. In conclusion, the *Koch* court said,

> We hold that a public prosecutor, acting within the general scope of his official authority in making a determination whether to file a criminal prosecution, is exercising a quasi-judicial and discretionary function and that where he acts in good faith he is immune from suit for an erroneous or negligent determination. This rule would not protect a prosecutor who, knowing that a particular charge is groundless in law or in fact, nonetheless intentionally files a

charge and thus acts through a corrupt motive.  In such a case he would not be acting within the scope of his authority.

*Id.* at 837.  *Koch* remains the law in Nebraska.  *See, e.g., Anderson v. Nebraska*, No. 4:17-CV-3073, 2018 WL 4354952, at *8 (D. Neb. Sept. 12, 2018) (recognizing continued vitality of *Koch*); *Gallion v. Woytassek*, 504 N.W.2d 76, 83 (Neb. 1993) (same).

Public prosecutors may also be sued in Hawaii.  "[A]bsolute immunity is not a defense under Hawai'i law in an action for malicious prosecution."  *Wong v. Cayetano*, 143 P.3d 1, 18 (Haw. 2006).  "[T]he prosecuting attorney is an officer of the executive branch of appellant, and thus subject to liability for his tortious conduct."  *Orso v. City of Honolulu*, 534 P.2d 489, 493 (Haw. 1975) (footnote omitted), *overruled on other grounds by Kahale v. City of Honolulu*, 90 P.3d 233, 239 (Haw. 2004).

**VI. Analysis of Absolute Prosecutorial Immunity.**

**A. Overview of Rationales Offered in Support of Absolute Prosecutorial Immunity.**  As the rationale for absolute prosecutorial immunity from constitutional torts, the majority adopts reasoning from our prior decisions addressing absolute prosecutorial immunity in common law torts and § 1983 actions.  In our first case on prosecutorial immunity to common law torts, this court said absolute prosecutorial immunity

> is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties.  These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust.

*Blanton v. Barrick*, 258 N.W.2d 306, 309–10 (Iowa 1977) (quoting *Imbler*, 424 U.S. at 422–23, 96 S. Ct. at 991); *see Beck v. Phillips*, 685 N.W.2d

637, 642 (Iowa 2004). We have also stated that the immunity "is not for the protection of the prosecutor personally, but for the benefit of the public" and "[a]lthough genuinely wronged plaintiffs are left without recourse in a civil suit for damages, the alternative would disserve the broader public interest." *Beck*, 685 N.W.2d at 643. Finally, we have noted that prosecutors are still checked by the possibility of professional discipline and criminal punishment. *Id.* at 643 n.2.

**B. Inapplicability of Policy Rationales of Absolute Immunity for Prosecutors.**

1. *Distinction between common law torts and constitutional torts.* A state constitutional tort is a claim that may be brought by a person for harms by government authorities arising from a violation of a rights creating provision of the Iowa Constitution. *Godfrey*, 898 N.W.2d at 847. The claim is implied in the substantive provisions of the Iowa Bill of Rights contained in article I of the Iowa Constitution. *See id.* at 868. It is supported by the basic principle that there is no right without a remedy. *Id.* at 867.

Constitutional torts are unlike common law torts. "The injuries inflicted by officials acting under color of law, while no less compensable in damages than those inflicted by private parties, are substantially different in kind . . . ." *Bivens*, 403 U.S. at 409, 91 S. Ct. at 2011 (Harlan, J., concurring in the judgment). A constitutional claim is designed "to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of popular will." Rosalie Berger Levinson, *Recognizing a Damage Remedy to Enforce Indiana's Bill of Rights*, 40 Val. U. L. Rev. 1, 11 (2005) (quoting *Bivens*, 403 U.S. at 404, 91 S. Ct. at 2008). Whereas common law torts focus on remediation of damages and compensation,

constitutional torts also focus on ensuring effective enforcement of constitutional rights. *See* Michael Wells, *Punitive Damages for Constitutional Torts*, 56 La. L. Rev. 841, 858–62 (1996). The harm to society is not captured by a judgment that solely compensates a plaintiff for his injury. *See* Michael Wells, *Constitutional Remedies, Section 1983 and the Common Law*, 68 Miss. L.J. 157, 189 (1998).

> A constitutional violation is different from an ordinary dispute between two private parties. . . . When a constitutional violation is involved, more than mere allocation of risks and compensation is implicated. The emphasis is not simply on compensating an individual who may have been harmed by illegal conduct, but also upon deterring unconstitutional conduct in the future. . . . Vindication of the social interest is distinct from adequate compensation goals of tort law and most statutory remedies . . . .

*Godfrey*, 898 N.W.2d at 876–77 (plurality opinion).

Relatedly, we also emphasized in *Godfrey* the importance of providing a cause of action for redress and deterrence of constitutional violations. *Id.* at 864–68 (majority opinion). We firmly stated, "If these individual rights in the very first article of the Iowa Constitution are to be meaningful, they must be effectively enforced." *Id.* at 865. "[T]he judiciary," we quoted Justice Harlan as saying, "has a particular responsibility to assure the vindication of constitutional interests." *Id.* (quoting *Bivens*, 403 U.S. at 407, 91 S. Ct. at 2010). We further explained the historical pedigree of remedies to enforce violations of constitutional rights. *Id.* at 866–68.

The majority ignores these considerations. In a conclusory fashion, the majority flatly declares, "The same public-interest considerations that justify the judicial process immunity apply whether the legal claims arise under common law or the state constitution." Of course, there was no such absolute at the time of the adoption of the Iowa Constitution of 1857,

but the majority declines to engage in originalist reasoning.  In any event, I strongly disagree with the notion that constitutional torts are simply garden variety torts.

2.  *Denial of remedy.*  Our legal tradition has traditionally ensured that there is a remedy for the violation of rights.  As Chief Justice Marshall stated in *Marbury,* "[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded."  5 U.S. at 163 (quoting 3 Blackstone at 23).  In *Bivens,* Justice Harlan explained that contemporary modes of thought at the time of the United States Constitutional Convention reflected "modes of jurisprudential thought which appeared to link 'rights' and 'remedies' in a 1:1 correlation."  403 U.S. at 400 n.3, 91 S. Ct. at 2007 n.3.

Denying a remedy for unconstitutional prosecutorial misconduct is anathema to that tradition, as it "drives a stake in the heart of a substantive legal doctrine."  *Baldwin II*, 915 N.W.2d at 284 (Appel, J., dissenting).  Karl Llewellyn explained, "Defect of remedy is defect of right." Aaron Belzer, Comment, *The Audacity of Ignoring Hope: How the Existing Qualified Immunity Analysis Leads to Unremedied Rights*, 90 Denv. U. L. Rev. 647, 673 (2012) (quoting Karl N. Llewellyn, *The Bramble Bush* 88 (Oxford Univ. Press ed., 2008) (1930)).  Justice Thomas notes the failure to find a constitutional violation when prosecutors fabricate evidence "leaves victims of egregious prosecutorial misconduct without a remedy." *Michaels v. McGrath*, 531 U.S. 1118, 1119, 121 S. Ct. 873, 873–74 (2001) (Thomas, J., dissenting from denial of certiorari).

3.  *Distinction between prosecutorial function and judicial function.* Prosecutors are unlike judges.  They perform different functions.  Judges are part of the judicial branch.  *See Marbury*, 5 U.S. at 177–78.

Prosecution is an executive power. *Morrison v. Olson*, 487 U.S. 654, 691, 108 S. Ct. 2597, 2619 (1988).

Judges are expected to be neutral decision-makers. *See State v. Mootz*, 808 N.W.2d 207, 217 (Iowa 2012). Prosecutors are expected to be vigorous advocates for the state while simultaneously seeing that justice is done. *State v. Graves*, 668 N.W.2d 860, 870 (Iowa 2003).

Judicial decisions are made in public. *See* Philip M. Pro, *Mis(understanding) Judging*, 7 Nev. L.J. 480, 484–85 (2007). Prosecutors exercise wide discretion behind closed doors. *See Schmidt v. State*, 909 N.W.2d 778, 788 (Iowa 2018). As two scholars note, prosecutors' offices are "black boxes" that "make[] it possible for prosecutors to do their daily work without explaining their choices to the public." Marc L. Miller & Ronald F. Wright, *The Black Box*, 94 Iowa L. Rev. 125, 129 (2008). "They decide whether to bring criminal charges, what charges to bring, whether to engage in plea negotiations and, through these and other powers, they in a very real sense determine what punishment a criminal defendant will face." Bidish Sarma, *Using Deterrence Theory to Promote Prosecutorial Accountability*, 21 Lewis & Clark L. Rev. 573, 579 (2017) [hereinafter Sarma].

Judicial decisions are subject to later judicial review. Iowa Const. art. V, § 4; Iowa R. App. P. 6.103(1). Many prosecutorial decisions, like an illegal decision to withhold exculpatory evidence, while technically subject to judicial control, are difficult to uncover or, even if noticed, will not result in a reversal or modification. Rachel E. Barkow, *Organizational Guidelines for the Prosecutor's Office*, 31 Cardozo L. Rev. 2089, 2090 (2010) [hereinafter Barkow, *Organizational Guidelines*].

Affiliating the prosecutorial function with the judicial function is a grave error. "To regard prosecution as part of the judicial power in any

way, shape, or form, is to nullify one of the Constitution's central features—its judicial safeguard against prosecutorial overreach." Saikrishna B. Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 569 (2005). "[I]t is critical to maintain separation between judicial and executive power because the judiciary supplies a critical check on prosecutions." Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stanford L. Rev. 989, 1003 n.63 (2006).

As a result, I think the majority draws a false equivalency between the judicial and prosecutorial functions. It is not enough to equate the two by the tenuous connection that both are involved in criminal justice. As Venckus vividly points out, "Football teams and referees may be on the same field, but they are not on the same side."

4. *Absence of historical support for absolute prosecutorial immunity.* When the Iowa Constitutions were adopted in 1846 and 1857, neither public nor private prosecutors enjoyed absolute immunity from lawsuits concerning their litigation misconduct. Indeed, at the time, "there was *not a single decision* affording prosecutors *any kind* of immunity defense from liability for malicious prosecution." Johns, *Reconsidering Absolute*, 2005 BYU L. Rev. at 114 (second emphasis added), *accord Imbler*, 424 U.S. at 421, 96 S. Ct. at 990–91 (noting the first case to address prosecutorial immunity was *Griffith*, 44 N.E. 1001 (1896)).

Absolute judicial immunity at common law was a functional doctrine that "extended only to individuals who were charged with resolving disputes between other parties or authoritatively adjudicating private rights." *Kalina*, 522 U.S. at 132, 118 S. Ct. at 510 (Scalia, J., concurring). Prosecutors neither "resolv[e] disputes between other parties" nor "authoritatively adjudicat[e] private rights." *Id.*

By contrast, prosecutors do undertake "official acts involving policy discretion but not consisting of adjudication." *Burns*, 500 U.S. at 500, 111 S. Ct. at 1947 (Scalia, J., concurring in the judgment in part and dissenting in part). But at common law, officials engaged in such functions only benefited from quasi-judicial immunity, a qualified immunity that "requir[ed] good faith" or an absence of malice. Johns, *Reconsidering Absolute*, 2005 BYU L. Rev. at 120; *see Burns*, 500 U.S. at 500, 111 S. Ct. at 1947. As Justice Scalia explained, "I do not doubt that prosecutorial functions, had they existed in their modern form in 1871, would have been considered quasi-judicial . . . . But that characterization does *not* support absolute immunity." *Burns*, 500 U.S. at 500–01, 111 S. Ct. at 1947 (citations omitted).

Likewise, the standard for malicious prosecution incorporated elements which effectively provided a qualified immunity. *Kalina*, 522 U.S. at 132–33, 118 S. Ct. at 511; *Center*, 2 Iowa at 406–07. No more was needed or given.

The absence of historical discussion in the majority opinion is striking. According to the majority, this court grants absolute immunity for only

> those governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed "with independence and without fear of consequences."

*Rehberg v. Paulk*, 566 U.S. 356, 363, 132 S. Ct. 1497, 1503 (2012) (quoting *Pierson*, 386 U.S. at 554, 87 S. Ct. at 1218). The majority opinion fails its own test because, as discussed, the framers of the Iowa Constitution would have known no such thing as absolute prosecutorial immunity. The

majority does not address the absence of historical support for absolute prosecutorial immunity.

Just last term, a majority of this court highlighted the role of history in determining the scope of immunity for *Godfrey* claims under the Iowa Constitution. In *Baldwin II,* the majority said, "We believe . . . that qualified immunity should be shaped by the historical Iowa common law as appreciated by our framers and the principles discussed in Restatement (Second) of Torts section 874A." 915 N.W.2d at 280 (majority opinion).

I do not believe that historical circumstances should control our interpretation of the Iowa Constitution. But I find the historical circumstances instructive. The lack of historical support for absolute prosecutorial immunity is one factor which leads me to dissent from the majority opinion.

5. *Need for effective deterrence.* One incident of prosecutorial misconduct is one too many. One study found that, since 1970, prosecutorial misconduct led to dismissal of charges, reversal of conviction, or reduction of sentence in more than 2000 cases. Steve Weinburg, *Harmful Error: Breaking the Rules*, Ctr. for Pub. Integrity, (updated May 19, 2014), https://publicintegrity.org/accountability/breaking-the-rules/ [https://perma.cc/AX5L-AW7F]. As one jurist put it, "There is an epidemic of *Brady* violations abroad in the land. Only judges can put a stop to it." *United States v. Olsen*, 737 F.3d 625, 626 (9th Cir. 2013) (Kozinski, J., dissenting from order denying petition for rehearing en banc); *see also* John C. Jeffries, Jr., *The Liability Rule for Constitutional Torts*, 99 Va. L. Rev. 207, 227 & n.68 (2013) [hereinafter Jeffries] (collecting evidence on "widespread noncompliance" with *Brady*).

Scholars have identified several causes of prosecutorial misconduct.

> [P]rosecutorial misconduct is largely the result of three institutional conditions: vague ethics rules that provide ambiguous guidance to prosecutors; vast discretionary authority with little or no transparency; and inadequate remedies for prosecutorial misconduct, which create perverse incentives for prosecutors to engage in, rather than refrain from, prosecutorial misconduct. These three conditions converge to create uncertain norms and a general lack of accountability for how prosecutors view and carry out their ethical and institutional obligations.

Peter A. Joy, *The Relationship Between Prosecutorial Misconduct and Wrongful Convictions: Shaping Remedies for a Broken System*, 2006 Wis. L. Rev. 399, 400 (2006).

Prosecutors also face pressures to quickly identify suspects and increase conviction rates, especially where, as in Iowa, they are elected. *See* Ephraim Unell, Note, *A Right Not to Be Framed: Preserving Civil Liability of Prosecutors in the Face of Absolute Immunity*, 23 Geo. J. Legal Ethics 955, 959 (2010) [hereinafter Unell]. "Whether they are elected or appointed, prosecutors often feel pressure to obtain convictions to demonstrate their effectiveness, as convictions are the lodestar by which prosecutors tend to be judged." Barkow, *Organizational Guidelines*, 31 Cardozo L. Rev. at 2091.

Without civil liability, deterrents to prosecutorial misconduct are insufficient. As Justice White wrote for himself and two other Justices, "[O]rdinarily, liability in damages for unconstitutional or otherwise illegal conduct has the very desirable effect of deterring such conduct. Indeed, this was precisely the proposition upon which § 1983 was enacted." *Imbler*, 424 U.S. at 442, 96 S. Ct. at 1000 (White, J., concurring in the judgment). Conversely,

> [s]hielded from the feedback mechanism of civil liability, prosecutors are free to engage in conduct, ethical and otherwise, devoid of the accountability brought to bear on officials and counselors in other fields of the law. This creates an incentive for prosecutors to substitute precautionary

functions aimed at avoiding the violation of civil rights with greater emphasis on attaining convictions.

Daniel Woislaw, *Absolute Immunity: Applying New Standards for Prosecutorial Accountability*, 26 C.R. L.J. 349, 350–51 (2016) [hereinafter Woislaw].

The majority relies on "other mechanisms that restrain official conduct, including vigorous judicial oversight in the district court, appellate review, postconviction-relief proceedings, attorney disciplinary proceedings, human resource management, and elections." Absent from the majority's list is another frequently cited mechanism, namely, the risk of criminal punishment.

The methods for deterring prosecutorial misconduct relied on by the majority are generally weak and have proven their ineffectiveness. I begin my analysis with the strongest control mechanism cited by the majority: judicial oversight.

A fair case can be made that absolute immunity makes sense for prosecutorial functions occurring only during trial. In this setting, there is supervision by a judge and monitoring by opposing counsel. Jeffries, 99 Va. L. Rev. at 221. Thus, certain prosecutorial misconduct, such as inflammatory statements to the jury, improper comment on the defendant's silence, or introduction of hearsay evidence, can, at least in theory, be corrected in the courtroom. *Id.*

However, judicial oversight of criminal proceedings cannot control or deter all or even most prosecutorial misconduct. Some types of prosecutorial misconduct, like withholding exculpatory evidence or fabricating inculpatory evidence, are difficult to uncover and never come to light in court proceedings. *See* Johns, *Unsupportable and Unjustified*, 80 Fordham L. Rev. at 521. They occur where "prosecutors act ex parte

and without judicial supervision, usually without correction from opposing counsel, and under professional and psychological circumstances that vitiate the incentives to comply." Jeffries, 99 Va. L. Rev. at 230. "The judicial process will by definition be ignorant of the violation when it occurs; and it is reasonable to suspect that most such violations never surface." *Imbler*, 424 U.S. at 443–44, 96 S. Ct. at 1001. Judge Kozinski wrote,

> A robust and rigorously enforced *Brady* rule is imperative because all the incentives prosecutors confront encourage them not to discover or disclose exculpatory evidence. Due to the nature of a *Brady* violation, it's highly unlikely wrongdoing will ever come to light in the first place. This creates a serious moral hazard for those prosecutors who are more interested in winning a conviction than serving justice. In the rare event that the suppressed evidence does surface, the consequences usually leave the prosecution no worse than had it complied with *Brady* from the outset. . . . If the violation is found to be material . . . the prosecution gets a do-over, making it no worse off than if it had disclosed the evidence in the first place.

*Olsen*, 737 F.3d at 630. When prosecutorial misconduct during trial is predicated on pretrial misconduct, absolute immunity should not apply. *See, e.g., Imbler*, 424 U.S. at 443–44, 96 S. Ct. at 1001; *Olsen*, 737 F.3d at 630; *McGhee v. Pottawattamie County*, 547 F.3d 922, 932–33 (8th Cir. 2008); *Zahrey v. Coffey*, 221 F.3d 342, 344, 349 (2d Cir. 2000).

Further weakening the functional rationale for applying absolute immunity to a prosecutor's actions at trial based on judicial oversight is the relative strength of the adverse parties. "[T]he brunt of prosecutorial misconduct falls disproportionately on the poor (including minorities) who cannot afford the aggressive and independent defense which can detect or deter misconduct." Unell, 23 Geo. J. Legal Ethics at 957; *accord* Johns, *Unsupportable and Unjustifiable*, 80 Fordham L. Rev. at 516. "Public

defenders[,] in particular, have scarce resources to allocate towards the discovery of prosecutorial misconduct . . . ." Woislaw, 26 C.R. L.J. at 368.

Moreover, judicial oversight of prosecutorial misconduct is negligible or nonexistent in the ninety-seven percent of cases that do not go to trial. Johns, *Unsupportable and Unjustified*, 80 Fordham L. Rev. at 517; Sarma, 21 Lewis & Clark L. Rev. at 576 n.11.

Finally, appellate courts are focused less on holding the state accountable for prosecutorial misconduct and more on determining "whether violations of a defendant's rights resulted in an unfair or unreliable determination of his guilt or innocence." Sarma, 21 Lewis & Clark L. Rev. at 583. Thus, "prosecutorial wrongdoing will only result in accountability-promoting consequences when it implicates the conviction's integrity." *Id.* at 584. Judge Smith of the United States Court of Appeals for the Third Circuit explains that appellate courts are limited in their control of prosecutorial misconduct by harmless error standards and by a reluctance to impose sanctions and name errant prosecutors. *See* D. Brooks Smith, *Policing Prosecutors: What Role Can Appellate Courts Play?*, 38 Hofstra L. Rev. 835, 840–43 (2010). "[T]he distinction between harmful and harmless [errors] is problematic because it doesn't illustrate how serious the misconduct was, merely that the court determined that it wouldn't have affected the ultimate outcome of the trial." *Innocence Project Research Illustrates Lack of Accountability for Prosecutors Who Commit Misconduct,* Innocence Project (Feb. 6, 2012), https://www.innocenceproject.org/innocence-project-research-illustrates-lack-of-accountability-for-prosecutors-who-commit-misconduct/ [https://perma.cc/BA7Z-945U]. Harmless error findings obviate the deterrence and remediation of prosecutorial wrongs. Johns, *Unsupportable and Unjustified*, 80 Fordham L. Rev. at 517.

A second control mechanism identified by the majority are disciplinary proceedings. As an empirical matter, numerous commentators have found that prosecutors are rarely disciplined. One found that, between 1970 and 2003, among 2000 convictions overturned or reduced as a result of prosecutorial misconduct, none resulted in criminal prosecution and only forty-four led to professional discipline. Johns, *Reconsidering Absolute*, 2005 BYU L. Rev. at 60. Another concluded that "prosecutors are disciplined rarely, both in the abstract and relative to private lawyers," and with respect to provisions that prosecutors and private attorneys have incentives to violate, "the discrepancy between discipline of prosecutors and private attorneys is enormous"). Fred C. Zacharias, *The Professional Discipline of Prosecutors*, 79 N.C. L. Rev. 721, 755 (2001) [hereinafter Zacharias]. Two reporters identified 381 homicide convictions thrown out for *Brady* violations and found that none of the prosecutors involved were publicly reprimanded, barred from practicing law, or convicted of a crime. Ken Armstrong & Maurice Possley, *Part 1: The Verdict: Dishonor*, Chi. Trib. (Jan. 11, 1999), https://www.chicagotribune.com/investigations/chi-020103trial1-story.html [https://perma.cc/FR84-WATQ].

The reasons for the paucity of professional discipline against prosecutors, commentators suggest, are manifold. Some relate to the nature of professional discipline rules. "Many of the rules of professional conduct . . . are blunt instruments—altogether inapplicable, or barely applicable, to full-time prosecutors." Zacharias, 79 N.C. L. Rev. at 725.

Other reasons relate to the incentives and resources of disciplinary authorities. General prohibitions against dishonest behavior and conduct prejudicial to the administration of justice are difficult and expensive to prove without an accompanying direct rule violation. *Id.* at 736. Areas

where prosecutors have discretion or where the law is unsettled are oftentimes avoided by disciplinary authorities for fear they may "embroil the disciplinary agency in litigation and aggressive claims by prosecutorial agencies that professional discipline violates the separation of powers." *Id.* at 737. Disciplinary authorities may believe their resources are better spent pursuing lawyers whose misconduct reflects self-interested greed. *Id.* at 757.

A third set of reasons for the lack of prosecutorial discipline relates to the incentives and resources of participants in criminal cases. "Prosecutors have no clients who are likely to complain. Criminal defendants rarely have incentives or resources to pursue complaints to the bar. Defense lawyers hesitate to antagonize adversaries with whom they must deal on a regular basis." *Id.* at 749.

Another control mechanism frequently cited to support absolute prosecutorial immunity is the possibility of criminal punishment. But criminal proceedings are not a forum in which claims against prosecutors are likely to be brought. As of 2011, only one prosecutor was criminally convicted for violating constitutional protections under 18 U.S.C. § 242 even though the statutory provision has been in effect since 1866. Johns, *Unsupportable and Unjustified*, 80 Fordham L. Rev. at 520. "Enforcement of similar state laws is equally sparse." Sarma, 21 Lewis & Clark L. Rev. at 585. "[O]nly one prosecutor has ever gone to jail for deliberate constitutional violation." *Id.* at 586. "[T]he bringing of criminal charges against a prosecutor is very rare, because the intent standard is a high bar and another prosecutor must be willing to press charges." Unell, 23 Geo. J. Legal Ethics at 960; *accord* Woislaw, 26 C.R. L.J. at 367.

Additionally, according to the majority, "human resource management" renders civil liability unnecessary. At the outset, it is

noteworthy that such systems are not generally thought sufficient to obviate tort liability in other fields. Are prosecutors' offices somehow different? The studies suggest not. "[P]rosecutors' offices appear far less equipped than other large organizations, including police departments, to manage and discipline employees." Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 Fordham L. Rev. 537, 543 (2011). "[M]ost prosecutor's offices don't even have internal systems for dealing with misconduct." *Innocence Project Research Illustrates Lack of Accountability for Prosecutors Who Commit Misconduct*, Innocence Project (Feb. 6, 2012), https://www.innocenceproject.org/innocence-project-research-illustrates-lack-of-accountability-for-prosecutors-who-commit-misconduct/ [https://perma.cc/ZE74-VKDS].

Observers doubt that discipline internal to prosecutorial offices is effective. "[O]ther common goals and policies, like obtaining a high conviction rate and prevailing in high-profile trials," undercut incentives to establish rigorous disciplining systems inside prosecutorial offices. Sarma, 21 Lewis & Clark L. Rev. at 594. Internal office discipline, Judge Kozinski suggests, is unlikely to prove useful: "Prosecutors need to know that someone is watching over their shoulders—someone who doesn't share their values and eat lunch in the same cafeteria." Alex Kozinski, *Criminal Law 2.0*, Preface, 44 Geo. L.J. Ann. Rev. Crim. Proc. iii, xxxii (2015). And "[c]onsidering the lack of transparency" in such systems, one author writes, "one would do well to treat claims that these internal mechanisms suffice with caution." Sarma, 21 Lewis & Clark L. Rev. at 593.

The final control mechanism cited by the majority is elections. But here again there is little to no control of misconduct. First, "[p]oor information flow between prosecutors and the public renders the political check ineffective." Russell M. Gold, *Promoting Democracy in Prosecution*, 86 Wash. L. Rev. 69, 78 (2011). Added to the low-information problem is the fact that prosecutorial elections are historically low turnout affairs. Sarma, 21 Lewis & Clark L. Rev. at 592. And, approximately eighty-five percent of prosecutor incumbents run unopposed. Ronald F. Wright & Marc L. Miller, *The Worldwide Accountability Deficit for Prosecutors*, 67 Wash. & Lee L. Rev. 1587, 1606 (2010). Finally, "because prosecutorial elections involve so many issues beyond misconduct, there is no clear line from misconduct (likely committed in the ranks by line prosecutors and not the head of the office) to a district attorney being voted out of office." Sarma, 21 Lewis & Clark L. Rev. at 592.

In summary, the alternative control mechanisms relied on by the majority, individually and together, amount to paper tigers. As one author explains, "The *need* for prosecutorial accountability is widely acknowledged. Scholars have established *the fact* that we do not hold prosecutors accountable. And, they have widely explored *how* specific methods created to hold them accountable have failed to achieve that end." *Id.* at 578. To deter prosecutorial misconduct, civil liability is necessary.

> If we are going to accept the premise that potential liability affects behavior, as advocates of immunities so fervently do, we need to look at the opposite side of the coin too, namely, if behavior is fundamentally affected by the *imposition* of tort liability, the *removal* of tort liability will also similarly impact behavior. If it is true that police [and prosecutorial] conduct will be chilled by tort rules, then the granting of immunity will lead police [and prosecutors] to engage in more unconstitutional activities because they do not have to worry about potential liabilities. We must consider both halves of the deterrence walnut.

*Baldwin II*, 915 N.W.2d at 289 (Appel, J., dissenting).

6. *Adverse effect on integrity of criminal justice system.* Our system of criminal justice gives prosecutors remarkable power and wide discretion. Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors: Lessons from Administrative Law,* 61 Stan. L. Rev. 869, 874, 884 (2009) (characterizing prosecutors as "leviathans" with "unchecked power"). At the same time, we expect a prosecutor's interest to be "not that [he] shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633 (1935).

> [W]hile he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.*

Ensuring that prosecutors are accountable to those expectations improves the integrity of the criminal justice system. "[O]ne would expect that the judicial process would be protected and indeed its integrity enhanced by denial of immunity to prosecutors who engage in unconstitutional conduct." *Imbler*, 424 U.S. at 442, 96 S. Ct. at 1000–01.

Conversely, failure to hold prosecutors accountable damages the integrity of our criminal justice system. "When publicized, cases of prosecutorial misconduct dramatically reduce confidence in the justice system." Unell, 23 Geo. J. Legal Ethics at 957. "When prosecutors infringe upon individual defendants' rights without recourse, respect for the system's integrity corrodes—and ethical prosecutors suffer the consequences ushered in by those who fail to abide by the rules." Sarma, 21 Lewis & Clark L. Rev. at 577; *see also* H. Mitchell Caldwell, *The Prosecutor Prince: Misconduct, Accountability, and a Modest Proposal*, 63 Cath. U. L. Rev. 51, 54 (2013) ("[P]rosecutorial misconduct is still unjust

when it harms the guilty, who, regardless of their crimes, are entitled to the full protection of the Constitution.").

7. *Hindering development of constitutional law.* Absolute immunity stalls the development of constitutional law. By dismissing claims at the initial pleading stage, courts do not interpret substantive constitutional protections or apply them to factual situations. Moreover, difficult-to-defeat immunities tend to dissuade lawyers and putative clients from even bringing suit upon weighing the practicalities of bringing constitutionally based legal actions. *See* Alexander A. Reinert, *Does Qualified Immunity Matter?*, 8 U. St. Thomas L.J. 477, 494–95 (2011). As a result, absolute immunity "tends to freeze the law in a state of perpetual uncertainty" and prevents the judicial opportunity to set a standard that will have positive implications across the state. Johns, *Reconsidering Absolute*, 2005 BYU L. Rev. at 130.

In *Baldwin II*, the majority justified allowing qualified immunity, and creating a gap between rights and remedies, out of a desire for "play in the joints." 915 N.W.2d at 278–79 (majority opinion). Limitations on damages remedies, the majority reasoned, would still allow courts to develop the scope of constitutional rights in certain cases, whereas closing the gap between rights and remedies, the majority cautioned, could inhibit development of substantive constitutional law. *Id.* at 278 n.6.

Here, instead of allowing "play in the joints," the majority simply snaps the joint. The sensitivity to continued development of constitutional rights in *Baldwin II* is absent.

8. *No applicability to* Brady *violations.* In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." But because *Brady* requires prosecutors to act in the "unharmonious role" of helping the opposing side by "crediting a version of the evidence at odds with their understanding," it has not been properly implemented by prosecutors. *United States v. Bagley*, 473 U.S. 667, 697, 105 S. Ct. 3375, 3391 (1985) (Marshall, J., dissenting) (first quotation); Jeffries, 99 Va. L. Rev. at 227–29 (second quotation).

Absolute immunity of *Brady* violations makes no sense. It thwarts, rather than advances, the fundamental role of the judicial process—to seek truth. *Imbler*, 424 U.S. at 441–45, 96 S. Ct. at 1000–02; *see Funk v. United States*, 290 U.S. 371, 381, 54 S. Ct. 212, 215 (1933). Justice White made the point well:

> It would stand this immunity rule on its head . . . to apply it to a suit based on a claim that the prosecutor unconstitutionally *withheld* information from the court. Immunity from a suit based upon a claim that the prosecutor suppressed or withheld evidence would *discourage* precisely the disclosure of evidence sought to be encouraged by the rule granting prosecutors immunity from defamation suits. *Denial* of immunity for unconstitutional withholding of evidence would encourage such disclosure. A prosecutor seeking to protect himself from liability for failure to disclose evidence may be induced to disclose more than is required. But, this will hardly injure the judicial process. Indeed, it will help it.

*Imbler*, 424 U.S. at 442–43, 96 S. Ct. at 1001. Further, as noted above, the judicial process lacks sufficient mechanisms to ensure proper oversight of such malfeasance. *See id.* at 443–44, 96 S. Ct. at 1001; *Olsen*, 737 F.3d at 630; Jeffries, 99 Va. L. Rev. at 230; Johns, *Unsupportable and Unjustified*, 80 Fordham L. Rev. at 516, 521; Unell, 23 Geo. J. Legal Ethics at 957; Woislaw, 26 C.R. L.J. at 368.

9. *Inefficient doctrine.* The prosecutorial immunity doctrine embraced by the majority is inefficient. This is because it generates

needless satellite litigation over whether a prosecutor's challenged conduct should be entitled to absolute or qualified immunity. *See Buckley*, 509 U.S. at 273, 113 S. Ct. at 2615 (noting that prosecutors are not entitled to absolute immunity for administrative and investigative functions); *Beck*, 685 N.W.2d at 642 (same); *see also Burr v. City of Cedar Rapids*, 286 N.W.2d 393, 395 (Iowa 1979). "Not only does the litigation of such questions consume effort, time, and money; it does so without any obvious payoff for the functional integrity of constitutional tort law." Jeffries, 99 Va. L. Rev. at 225.

The questions generated by the doctrine are diverse, intricate, and mostly beside the point. Should absolute immunity apply similarly where prosecutors obtain a search warrant as to when they obtain an arrest warrant? *See KRL v. Moore*, 384 F.3d 1105, 1114 (9th Cir. 2004). Does it matter if prosecutors are seeking evidence of additional crimes as opposed to evidence of crimes for which a defendant has already been indicted? *See id.* at 1112. Should prosecutors be entitled to a different immunity when they present false information to a court as compared to when they put that information in a sworn affidavit? *See Kalina*, 522 U.S. at 120, 118 S. Ct. at 505 (majority opinion). How about when prosecutors employ fabricated evidence in plea bargaining as compared to employing the evidence during trial?

Some of the results in the cases are examined are striking. For instance, one court held that a prosecutor is entitled to qualified immunity for manufacturing tainted evidence but absolute immunity for presenting that same tainted evidence in court. *Michaels v. New Jersey*, 222 F.3d 118, 123 (3d Cir. 2000). *But cf. McGhee*, 547 F.3d at 932–33 (holding that prosecutors are not entitled to absolute immunity for fabricating evidence before filing criminal charges and then later presenting that evidence in

court); *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (same); *Zahrey*, 221 F.3d at 344, 349 (same).

Rather than focus judicial attention on the extent of a prosecutor's immunity, we should devote those resources to vindicating society's interest in enforcement of the constitution. "A simplified approach—applying qualified immunity in all cases—would serve public policy, respect historical understanding, and simplify and streamline civil rights litigation." Johns, *Unsupportable and Unjustified*, 80 Fordham L. Rev. at 511.

**C. Issue of First Impression.** The majority says, "Venckus has not established our prior decisions should be overruled." "To the contrary," the majority continues, "the judicial process immunity is of long standing in Iowa and was recently reaffirmed in *Minor [v. State*, 819 N.W.2d 383, 397–99 (Iowa 2012)]."

There is no stare decisis issue here. We have never decided whether, and to what extent, *prosecutors* should enjoy absolute immunity from constitutional torts. Venckus is, at least with respect to his constitutional torts, not asking that we overrule precedent. Stare decisis "is a Latin term meaning 'to stand by things decided.'" *State v. Miller*, 841 N.W.2d 583, 586 (Iowa 2014) (quoting *Stare decisis*, *Black's Law Dictionary* (9th ed. 2009)). If something is not decided, there is nothing by which stare decisis calls on us to stand.

For instance, the majority says the judicial process immunity was recently reaffirmed in *Minor*. But *Minor* does not control this case. *Minor* involved a § 1983 claim, not an Iowa constitutional claim. 819 N.W.2d at 389.

There is another reason why stare decisis is of limited import here. Even if one were to assume prosecutors' absolute immunity to common

law torts is a constraining precedent with respect to constitutional torts, that immunity is a judge-made doctrine. We have a "responsibility to reconsider court-made rules when their continued validity is questionable." *Turner v. Turner*, 304 N.W.2d 786, 787 (Iowa 1981). "When a rule is of judicial origin, it is subject to judicial change." *Id.*; *see Bd. of Water Works Trs. v. SAC Cty. Bd. of Supervisors*, 890 N.W.2d 50, 61 (Iowa 2017) (recognizing that the principles supporting stare decisis are of lower force when a rule is of judicial origin).

There is one aspect of the majority's discussion in which I agree. The majority recognizes that continued adherence to our precedents depends on their persuasive power. In Iowa, "[i]f precedent is to have any value it must be based on a convincing rationale." *State v. Cline*, 617 N.W.2d 277, 285 (Iowa 2000) (alteration in original) (quoting *State v. James*, 393 N.W.2d 465, 472 (Iowa 1986) (Lavorato, J., dissenting)), *abrogated in part on other grounds by State v. Turner*, 630 N.W.2d 601, 606 & n.2 (Iowa 2001). "The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision." *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010). If the common law precedents were persuasive, analogical reasoning would suggest we follow that rationale.

However, as discussed above, our precedents on absolute prosecutorial immunity in common law torts do not provide a convincing rationale for absolutely immunizing prosecutors from constitutional torts. Common law and constitutional torts are dissimilar, the prosecutorial function is unlike the judicial function, and the other policy rationales in the common law cases are dubious.

There has been, unfortunately, an emerging trend in this court to misapply the doctrine of stare decisis, usually to shore up favored policy

arguments not based upon constitutional analysis. *See, e.g., State v. Brown*, ___ N.W.2d ___, ___ (Iowa 2019) (Appel, J., dissenting) (noting majority's citing of cases as precedent where issue was not contested by parties); *Westra v. Iowa Dep't of Transp.*, ___ N.W.2d ___, ___ (Iowa 2019) (Appel, J., dissenting) (noting majority's citing of case deciding federal constitutional law as precedent under Iowa Constitution). *See generally Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 614–15 (Iowa 2017) (Appel, J., concurring in part and dissenting in part) (noting that stare decisis requires that the issue be actually litigated by the parties). As I have previously noted,

> We should be particularly alert to avoid masking preferred policy choices in a stare decisis costume. And, an overburdened court may be tempted to over read precedent in the name of efficiency and quick results, but such an approach runs the risk of uncritical dispositions.

*Bd. of Water Works Trs.*, 890 N.W.2d at 86 (Appel, J., concurring in part and dissenting in part).

**D. Proper Scope of Prosecutorial Immunity.** In *Baldwin II*, a majority of this court recently held that government officials are entitled to a form of qualified immunity when they are sued under article I, sections 1 and 8 of the Iowa Constitution. 915 N.W.2d at 281. Specifically, the majority said,

> [W]ith respect to a damage claim under article I, sections 1 and 8, a government official whose conduct is being challenged will not be subject to damages liability if she or he pleads and proves as an affirmative defense that she or he exercised all due care to conform to the requirements of the law.

*Id.* I, of course, dissented in *Baldwin II. Id.* (Appel, J., dissenting). In any event, the qualified immunity developed by a majority of the court in *Baldwin II* is more than enough protection for most prosecutorial

functions. Affording any more protection to prosecutors severs the connection between rights and remedies, removes a necessary deterrent, is historically unjustified, hinders development of constitutional law, damages the integrity of the criminal justice system, and inefficiently creates needless satellite litigation to characterize the prosecutorial function involved. Greater protection also has absolutely no role where prosecutors impair the truth-seeking role of the judicial process by withholding exculpatory evidence or fabricating inculpatory evidence.

There is one area, however, where I believe the case for absolute prosecutorial immunity is strongest, namely, for actions taken pursuant to the judicial process in open court. At least the judicial supervision of such functions, in tandem with the check provided by opposing counsel, provides some degree of protection and renders a civil damages remedy unnecessarily costly as compared to its benefits. Still, to the extent such an exception is recognized, it cannot swallow the general rule that prosecutors are not entitled to absolute immunity on matters involving functions predicated on pretrial misconduct, such as *Brady* violations, or presenting evidence at trial that was previously fabricated, because the judicial and advocatory checks are ineffective in such circumstances.

**E. Proper Resolution of Claims Against Prosecutors.** Venckus complains about the prosecutors' pretrial conduct. Therefore, absolute prosecutorial immunity should not apply.[3] Accordingly, we should affirm the district court judgment on these claims.

---

[3]The majority says a "government official" is entitled to absolute immunity for "any function intimately related to the judicial phase of the criminal process." But this case does not call upon this court to decide the immunity of "any government official." We are only concerned with the immunity of prosecutors and police. Accordingly, the majority's overbroad statement is mere dicta.

**VII.  Even if Prosecutors Are Entitled to Absolute Immunity for Some Functions, Such Limited Absolute Immunity Should Be Strictly Tied to Judicial Functions and Does Not Provide a Basis for Dismissal of Venckus's Petition.**

**A.  Introduction.**   In this section, I assume, for purposes of argument, that absolute immunity is available to prosecutors in some settings.  But even if one embraces some form of absolute immunity for prosecutors, such a doctrine does not provide the basis for dismissing the petition in this case.

Venckus argues that the prosecutors acted illegally and unconstitutionally in four ways.  First, he asserts that prosecutors recklessly ignored exculpatory evidence he provided to prosecutors, including expert reports and alibi testimony.  Second, he asserts that prosecutors went shopping for a favorable expert after receiving an unfavorable report on DNA transfer from their first expert, a state DNA expert.  In the course of their shopping, Venckus asserts, prosecutors pressured a state criminalist to offer an opinion contrary to the DNA expert.  The criminalist, Venckus notes, lacked training in DNA transfer.  Third, he asserts that prosecutors filed an ethics complaint against his attorney on an unrelated matter that was later dismissed.  Fourth, he asserts that prosecutors offered Markley, the actual rapist, a lenient plea deal in exchange for testimony against him.

If there is a prosecutorial absolute immunity doctrine, the State has the strongest argument with respect to the fourth assertion.  There is authority for the proposition that offering a plea deal in exchange for testimony is a function entitled to absolute immunity.  *See Beck*, 685 N.W.2d at 643 (stating that a prosecutor is absolutely immune for decision to bring charges and for decision not to bring charges); *Hike v. Hall*, 427 N.W.2d 158, 160–61 (Iowa 1988) (holding that prosecutorial decisions to

defer prosecution and reduce charges are entitled to absolute immunity). Filing an ethics complaint against a defense attorney on an unrelated matter is not entitled to absolute immunity.

However, even if we were to embrace some form of prosecutorial immunity, the majority errs in concluding that the functions associated with the first and second assertions—recklessly ignoring exculpatory evidence and expert shopping—are entitled to absolute immunity.  As the United States Supreme Court has cautioned,

> Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive.

*Burns*, 500 U.S. at 495, 111 S. Ct. at 1944 (majority opinion).  Similarly, we have said, "We will be sparing in our recognition of absolute immunity and will not extend it further than its justification warrants." *Beck*, 685 N.W.2d at 643.  A prosecutor's investigatory and administrative functions are not protected by absolute immunity.  *Id.* at 642; *see also Burr*, 286 N.W.2d at 395.

**B.  Expert Shopping and Pressuring Witnesses.**  In *Buckley*, 509 U.S. at 272, 113 S. Ct. at 2615, the United States Supreme Court considered whether prosecutors were entitled to absolute immunity in shopping for experts until they found one that would provide the opinion they sought.  The expert shopping related to a boot print found at the scene of the crime.  *Id.* at 262, 113 S. Ct. at 2610.  After three studies performed by state and municipal criminologists could not make a reliable connection between the boot print and a pair of boots supplied by the target of the prosecutorial investigation, prosecutors found an expert willing to testify to a positive identification.  *Id.*  The expert they found was an

anthropologist with a reputation "for her willingness to fabricate unreliable expert testimony." *Id.* At the time of the witness shopping, probable cause had not yet been established and prosecutors were working "hand in hand" with police. *Id.* at 272, 113 S. Ct. at 2615. The witness shopping, the arrestee charged, amounted to a conspiracy to manufacture false evidence. *Id.*

No absolute immunity, the *Buckley* Court held, applied to the prosecutors' actions. *Id.* at 276, 113 S. Ct. at 2617. The *Buckley* Court reasoned that "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer," absolute immunity is inapplicable. *Id.* at 273, 113 S. Ct. at 2616. The prosecutors' mission in expert shopping, the *Buckley* Court said, "was entirely investigative in character." *Id.* at 274, 113 S. Ct. at 2616.

The *Buckley* Court also addressed the issue of timing vis-à-vis probable cause. The *Buckley* Court explained that "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* But "[o]f course," the *Buckley* Court emphasized, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Id.* at 274 n.5, 113 S. Ct. at 2616 n.5. "Even after that determination, . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* Further, the *Buckley* Court continued, it is improper to conclude "a prosecutor's actions in 'obtaining, reviewing, and evaluating' evidence are always protected by absolute immunity" because "some of these actions may fall on the administrative, rather than the judicial, end of the prosecutor's activities, and therefore be entitled only to qualified immunity." *Id.* at 276 n.7, 113 S. Ct. at 2617 n.7 (quoting *Imbler*, 424 U.S. at 431 n.33, 96 S. Ct. at 995 n.33).

Finally, the *Buckley* Court stressed that fabrication of evidence is not a function entitled to absolute immunity. *Id.* at 272, 276, 113 S. Ct. at 2615, 2617. No common law tradition, the *Buckley* Court explained, granted absolute immunity for fabrication of evidence. *Id.* at 275, 113 S. Ct. at 2616–17.

The alleged facts in *Buckley* are largely parallel to the facts before us. As in *Buckley*, prosecutors here allegedly shopped for an expert willing to testify favorably after receiving unfavorable reports from a state expert. In *Buckley*, the prosecutors found an anthropologist with a reputation for fabricating testimony; here, the prosecutors found a criminalist without training in the subject matter about which she was asked to testify. Indeed, the alleged circumstances here are arguably worse and more attenuated from any prosecutorial function entitled to absolute immunity. Unlike in *Buckley*, prosecutors here allegedly *pressured* the witness to testify against Venckus. In my view, the alleged actions of the prosecution in witness shopping and pressuring a witness to testify are not entitled to absolute immunity protection.

Of course, there is one difference between *Buckley* and this case. In *Buckley*, the prosecutorial conduct occurred before probable cause was found. By contrast, Venckus suggests that probable cause may have existed at one point, and even though that probable cause disappeared shortly thereafter, the prosecutorial misconduct of which Venckus complains occurred after probable cause had existed.

Does the temporary existence of probable cause matter? As noted above, the *Buckley* Court clarified that prosecutors can still be liable after a probable cause finding. This clarification was based on the same rationale we utilize in defining immunities, namely, functional analysis.

But perhaps the fact that probable cause preceded prosecutors' expert shopping, attempts to manufacture evidence, and witness pressure is relevant as one factor to consider. Neither this court nor the Supreme Court have addressed how to determine whether a prosecutor is engaged in investigatory or administrative functions after a probable cause finding. The lower federal courts have adopted two different approaches to post-probable cause immunity where prosecutors allegedly coerce witnesses or fabricate evidence.

The D.C. Circuit takes a categorical approach, holding that coercing a witness to testify falsely is an investigative function meriting qualified immunity. *Moore v. Valder*, 65 F.3d 189, 194, (D.C. Cir. 1995). The *Moore* court explained,

> Intimidating and coercing witnesses into changing their testimony is not advocatory. It is rather a misuse of *investigative* techniques legitimately directed at exploring whether witness testimony is truthful and complete and whether the government has acquired all incriminating evidence. It therefore relates to a typical police function, the collection of information to be used in a prosecution.

*Id.*

In contrast, the Ninth Circuit tries to ascertain a prosecutor's state of mind to determine if—when fabricating evidence, coercing witnesses, withholding exculpatory evidence, or failing to interview exculpatory evidence—the prosecutor was acting in an advocatory or investigative role. *Genzler v. Longanbach*, 410 F.3d 630, 638–39 (9th Cir. 2005). In *Genzler*, the Ninth Circuit held that a prosecutorial meeting with a potential witness was "a process of manufacturing evidence while performing police-type investigative work—not [prosecutors] acting as advocates by actively preparing [the witness] for her testimony in court." *Id.* at 643.

Under either *Buckley, Moore,* or *Genzler,* the prosecutors' expert shopping and pressuring of the state criminalist are not entitled to absolute immunity. As the *Genzler* court said, the prosecutors in Venckus's case were engaged in "a process of manufacturing evidence while performing police-type investigative work—not [prosecutors] acting as advocates by actively preparing [the witness] for her testimony in court." *Id.* at 643.

**C. Recklessly Ignoring Exculpatory Material.** Recklessly ignoring exculpatory material is not an evaluation of evidence in preparation for trial or otherwise an advocatory function. *See Broam v. Bogan,* 320 F.3d 1023, 1031 (9th Cir. 2003). Our "sparing" recognition of absolute immunity and refusal to "extend it further than its justification warrants," *Beck,* 685 N.W.2d at 643, provide no basis for labeling an investigatory omission as an advocatory function. The prosecutors' alleged failure is therefore not entitled to absolute immunity.

The foregoing conclusion is supported by caselaw addressing claims that police officers ignored exculpatory evidence. Courts have held that knowingly and willfully ignoring exculpatory evidence is a failure of a police officer's investigative function exposing the officer to liability for a constitutional tort. *Wilson v. Lawrence County,* 260 F.3d 946, 957 (8th Cir. 2001); *Sanders v. English,* 950 F.2d 1152, 1162 (5th Cir. 1992), *abrogation on other grounds as recognized by Pulliam v. City of Horn Lake,* No. 92–7696, 1994 WL 442316, at *1 n.5 (5th Cir. 1994) (per curiam). The *Wilson* court denied qualified immunity to police officers because "[t]here is no countervailing equally important governmental interest that would excuse the [officers] from fulfilling their responsibility to investigate these [exculpatory] leads when faced with an involuntary confession and no reliable corroborating evidence." 260 F.3d at 957.

**VIII.  Police Officer Absolute Immunity.**

**A.  Introduction.**    With respect to the application of absolute immunity to police officers, the majority declares, "Absolute immunity extends to police officer functions falling within the scope of the judicial process immunity, e.g., testimony as an ordinary witness."  "[T]his is true," the majority continues, "whether the claims arise under common law or under the state constitution."  Because the majority does not decide the issue of absolute immunity for police officers, the discussion is dicta.  I am not willing to let it go at that, however, because the majority's suggested approach is contrary to Iowa law, federal precedent, and common law.

**B.  No Absolute Immunity Under Iowa Caselaw for Police Officers.**    The majority's statements are overbroad and flatly contrary to Iowa caselaw.  In *Vander Linden v. Crews*, 205 N.W.2d 686, 687 (Iowa 1977), Paul Crews was secretary of the Iowa Board of Pharmacy Examiners and the director of Drug Law Enforcement.  Crews arrested Vander Linden without a warrant and filed a preliminary information against him.  *Id.*

The *Vander Linden* court held Crews was a public officer amenable to a suit for malicious prosecution.  *Id.* at 688, 691.  The court also said it would make no difference if Crews were considered a peace officer.  *Id.* at 687.  The *Vander Linden* court further held, "We have not . . . extended the doctrine of judicial or governmental immunity to other offices of a nonjudicial character, and decline to do so now."  *Id.* at 689.  After discussing the policy rationale for extending absolute immunity to law enforcement officials articulated in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949), the *Vander Linden* court said,

> We are unimpressed by the fears expressed by Judge Hand in *Gregoire* set out above.  We believe it possible to determine whether claims for damages for malicious prosecution are well founded, and agree . . . that to deny a

person claimed to be injured by the malicious action of an officer not occupying a judicial position, to be "monstrous."

205 N.W.2d at 690. The *Vander Linden* court also quoted at length from a decision of the Michigan Supreme Court which itself relied on a dissenting opinion from California. *Id.* at 691. In the California opinion, the dissent wrote,

> The majority opinion states that public officers should be protected from "vindictive and retaliatory damage suits." The reverse situation is presented here: Any employee, clerk, assistant, investigator, inspector or deputy is, by this holding, protected when he has instigated the commencement and prosecution of a vindictive and malicious suit. This is true because the allegations of plaintiff's complaint must be taken as true, and he has alleged that the action was brought with malice and without probable cause.

*White v. Towers*, 235 P.2d 209, 216 (Cal. 1951) (en banc) (Carter, J., dissenting). The Michigan Supreme Court agreed, stating,

> With that reasoning, we agree. Extension of immunity to virtually any peace officer or law enforcement officer would result in a practical nullification of the tort of malicious prosecution. We conclude that assurance of full compensatory justice to the damaged individual should be paramount, and that the interest of the individual in protection from Mala fide prosecutions is best assured by making the putative tortfeasor civilly liable for malicious prosecution.

*Belt v. Ritter*, 189 N.W.2d 221, 223 (Mich. 1971). Applying this reasoning, the *Vander Linden* court concluded, "[T]he doctrine of judicial immunity shall not be further extended to protect and shield nonjudicial officers from civil suits where actual malice is alleged." 205 N.W.2d at 691.

In *Moser v. Black Hawk County*, 300 N.W.2d 150, 153 (Iowa 1981), we reiterated that police officers are not entitled to absolute immunity. Pointing to *Paige v. City of Chariton*, 252 N.W.2d 433, 438 (Iowa 1977), and *Sarvold v. Dodson*, 237 N.W.2d 447, 448 (Iowa 1976), the *Moser* court highlighted "our cases that recognize peace officers who instigate or

procure a prosecution may be held liable for malicious prosecution, other elements, including actual malice, being present." 300 N.W.2d at 153. The *Moser* court emphasized, "The general rule that law enforcement officers are absolutely privileged to institute criminal proceedings and therefore have an indefeasible immunity against an action for malicious prosecution is not applied in this jurisdiction." *Id.* at 153 n.1 (citation omitted); *see also Rogers v. Hill*, 576 P.2d 328, 333 (Or. 1978) (en banc) (holding that a police officer may be liable for "[a]n active part in continuing an unfounded criminal proceeding").

Other decisions of this court are to the same effect. "Iowa courts . . . have traditionally declined to extend judicial immunity to nonjudicial officers where malice was alleged." *Muzingo v. St. Luke's Hosp.*, 518 N.W.2d 776, 777 (Iowa 1994). "[W]e have described other public officers or peace officers charged with investigative duties as 'nonjudicial officers' to whom the protection should not extend." *Webster Cty. Bd. of Supervisors v. Flattery*, 268 N.W.2d 869, 877 (Iowa 1978).

The majority's statements are contrary to that well-settled precedent because the majority would protect "police officer functions falling within the scope of the judicial process immunity," which it defines in turn as "conduct 'intimately associated with the judicial phase of the criminal process.'" But immunizing an officer's conduct associated with the judicial phase of the criminal process is clearly contrary *Vander Linden,* where the public officer was amenable to suit for arresting and filing an information against Vander Linden. 205 N.W.2d at 687, 691. The majority's approach cannot be squared with the rule in this jurisdiction that law enforcement officers are not "absolutely privileged to institute criminal proceedings." *Moser,* 300 N.W.2d at 153 n.1.

Given the apparent contradiction with our precedent and the absence of any indication from the majority that it is intending to overrule that precedent, I think the majority opinion must be read as only recognizing absolute immunity from defamation actions for a police officer's testimony in court.  If the majority is overruling our precedent, it should say so.

**C. No Absolute Immunity Under Federal Precedent for Police Officers.**  The majority's statements regarding the applicability of absolute immunity to peace officers are also inconsistent with federal law.  Under federal law, police officers generally get qualified immunity.  *See Scheuer*, 416 U.S. at 245, 94 S. Ct. at 1691; *Pierson*, 386 U.S. at 557, 87 S. Ct. at 1219.

For example, police officers are not entitled to absolute immunity under federal law when they act as complaining witnesses.  *Malley v. Briggs*, 475 U.S. 335, 343, 106 S. Ct. 1092, 1097 (1986) (holding that an officer applying for a warrant without probable cause may be entitled to qualified immunity but is not entitled to absolute immunity); *see* Eugene Scalia, Comment, *Police Witness Immunity Under § 1983*, 56 U. Chi. L. Rev. 1433, 1454–59 (1989) [hereinafter Scalia] (explaining that the Supreme Court held police officers were entitled to absolute immunity when functioning as an ordinary witness testifying at trial and were not entitled to absolute immunity when functioning as a complaining witness).

> Where . . . the constitutional tort is the action of a police officer in initiating a baseless prosecution, his role as a "complaining witness" renders him liable to the victim under section 1983, just as it did at common law, and the fact that his testimony at a judicial proceeding may have been the means by which he initiated the prosecution does not permit him to transpose the immunity available for defamation as a defense to malicious prosecution.

*White v. Frank*, 855 F.2d 956, 961 (2d Cir. 1988). *See generally* Piper M. Willhite, Comment, *Defamation Law: Privileges from Liability: Distinguishing Quasi-Judicial Proceedings from Proceedings Which Are Preliminary to Judicial Hearings*, 47 Okla. L. Rev. 541, 548 n.61 (1994) (collecting cases that do not extend absolute immunity to a witness's statements leading up to a judicial proceeding).

Judge Posner elaborated on the rationale for withholding absolute immunity from police officers:

> It is true that so far as potential exposure to suit by members of the public is concerned, a policeman is in much the same position as a judge or prosecutor yet enjoys no absolute immunity from civil damage actions. There are reasons for the difference in treatment. One, which is merely realistic, is that a policeman rarely has sufficient assets to be worth suing (of course this is also true of many assistant district attorneys), unless he is indemnified by his employer—in which event the suit is unlikely to have much impact on his performance of his duties. The threat of suit is less likely to affect the performance of his duties for another reason as well: he has less discretion than a judge or prosecutor. He is also more amenable to discipline and control by his superiors if he seems to be flagging. Finally, unless policemen can be sued for using excessive force or for false arrest, many victims of these excesses will be without any remedy.

*Forrester v. White*, 792 F.2d 647, 662 (7th Cir. 1986) (Posner, J., dissenting).

**D. Absolute Immunity for Police Officers Is Contrary to Common Law.** The majority's views on the application of absolute immunity to police officers is also contrary to the law at the time of Iowa's founding. The majority would protect police officers under its expansive "judicial process immunity." But, as discussed, judicial immunity at common law was "extended only to individuals who were charged with resolving disputes between other parties or authoritatively adjudicating private rights." *Kalina*, 522 U.S. at 132, 118 S. Ct. at 510 (Scalia, J.,

concurring). Police officers do no such thing. Police officers are not "jury, judge, and executioner." *Screws v. United States*, 325 U.S. 91, 106, 65 S. Ct. 1031, 1038 (1945) (plurality opinion). "The common law has never granted police officers an absolute and unqualified immunity . . . ." *Pierson*, 386 U.S. at 555, 87 S. Ct. at 1218.

Common law might have protected certain police officers from defamation actions. Absolute immunity at common law protected—from defamation actions—all "statements made in the course of a judicial proceeding and relevant to the matter being tried." *Kalina*, 522 U.S. at 133, 118 S. Ct. at 511; *see Hoar v. Wood*, 44 Mass. 193, 197 (1841). It did not matter if the statements were false or borne of malicious intent. *Kalina*, 522 U.S. at 133, 118 S. Ct. at 511; *Hoar*, 44 Mass. at 197. The immunity applied to lawyers and witnesses. *Kalina*, 522 U.S. at 133, 118 S. Ct. at 511. The policy rationale for the immunity was that "full freedom of speech" would be "best calculated to subserve the purposes of justice." *Hoar*, 44 Mass. at 197–98. Importantly, as noted, this immunity only applied to defamation actions, i.e., libel and slander, and not to other types of actions. *Kalina*, 522 U.S. at 133, 118 S. Ct. at 511.

The majority notes that one example where a police officer could be protected by absolute immunity is for "testifying as an ordinary witness." Such testimony at trial would be protected at common law from defamation actions. But police officers would be liable to other suits. For instance, police officers who initiated a criminal prosecution could be liable to a malicious prosecution claim. *White*, 855 F.2d at 961; Scalia, 56 U. Chi. L. Rev. at 1453–54.

**E. Resolution of Police Officer Immunity in this Case.** The majority does not decide whether the police officer's actions in this case would be entitled to absolute immunity. But there are important reasons

discussed above to believe the dicta is off the mark. We have already declined in a series of cases to extend absolute judicial immunity to police officers. *Muzingo*, 518 N.W.2d at 777; *Moser*, 300 N.W.2d at 153; *Webster Cty. Bd. of Supervisors*, 268 N.W.2d at 877; *Vander Linden*, 205 N.W.2d at 687. Further, Officer Rich acted as the complaining witness. *Malley*, 475 U.S. at 343, 106 S. Ct. at 1097; *White*, 855 F.2d at 961; Scalia, 56 U. Chi. L. Rev. at 1453–54.

### IX. Municipal Immunity.

As discussed in *Baldwin v. City of Estherville*, (*Baldwin IV*), ___ N.W.2d ___, ___ (Iowa 2019) (Appel, J., concurring in part and dissenting in part), even if individual officers and agents of the government are entitled to immunity, it should not extend to claims against a municipal entity under respondeat superior. The same rationale applies here. Municipal entities were not immunized at common law. *Id.* at ___. Further, damages remedies are necessary to enforce constitutional rights, and "the municipal entity itself is likely to be in the best position to implement corrective measures to vindicate constitutional rights." *Id.* at ___. Indeed, municipal liability can target those "above the fray of prosecutorial decisions" and thus altogether avoid the dubious policy rationales asserted in favor of absolute prosecutorial immunity. Woislaw, 26 C.R. L.J. at 374.

### X. Conclusion.

I would hold that prosecutors are not absolutely immune from a suit for damages except to the extent they are functioning in open court and are not acting based on misconduct occurring outside the trial setting. Because Venckus does not claim any prosecutorial misconduct during trial, I would affirm the district court judgment with respect to the prosecutors.

Were I to apply the common law absolute prosecutorial immunity to Venckus' common law and constitutional torts against the prosecutors, I would affirm in part and reverse in part. Under that standard, I do not think the prosecutors are liable for the plea deal offered to Markley. Otherwise, I think the district court correctly denied the motion to dismiss.

With respect to the police officer, I would affirm the district court's denial of the motion to dismiss. Police officers are not entitled to absolute immunity except, as with all witnesses, when testifying during trial. Venckus's claims do not relate to any testimony at trial by Officer Rich.

I therefore dissent from division III of the majority opinion. I concur in the result of division IV of the majority opinion.